# 2023 UT App 15

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
KARRAR THAER SUHAIL,
Appellant.

Opinion
No. 20200284-CA
Filed February 9, 2023

Third District Court, Salt Lake Department
The Honorable Todd M. Shaughnessy
No. 161913371

Andrea J. Garland, Attorney for Appellant

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which JUDGES
MICHELE M. CHRISTIANSEN FORSTER and DAVID N. MORTENSEN
concurred.

TENNEY, Judge:

¶1      At the close of a several-day trial, a jury convicted Karrar
Suhail of murder, aggravated burglary, aggravated robbery, and
obstructing justice. On appeal, Suhail challenges his convictions
on several grounds, and he also asks for a rule 23B remand for
factual development of an ineffective assistance of counsel claim.
For the reasons set forth below, we affirm his convictions and
deny the request for a remand.

BACKGROUND[1]

*The Murder*

¶2     For at least four years, Suhail was addicted to oxycodone. He often bought pills from Victim, who had prescriptions for alprazolam (Xanax), methadone, and oxycodone and would then sell his pills to Suhail and other local customers. When Suhail took the pills, he would be "calm and relaxed." But when he didn't get the pills, he would "act out" and become "upset" and "[a]gitated."

¶3     Suhail's drug use created problems in his relationship with his ex-girlfriend (Ex-Girlfriend). They had dated on and off for about seven years and had one child (Child) together. Suhail sometimes helped financially with Child, but he "wasn't very dependable," and his support was "never consistent."

¶4     On Thursday, December 8, 2016, Ex-Girlfriend took Child to see Suhail. Suhail became "emotional" during this visit when Ex-Girlfriend told him that she had recently had a miscarriage. After the visit, Ex-Girlfriend took Suhail to his brother's restaurant (the Restaurant) and a nearby gas station to buy him cigarettes. At the gas station, they had an argument about their relationship. Suhail was "frustrated" that another man was texting Ex-Girlfriend, and Ex-Girlfriend told Suhail that she "didn't want to be with him anymore." Ex-Girlfriend took Suhail back to the Restaurant, but she returned at about 10:00 p.m. that

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Archuleta*, 2021 UT App 66, n.1, 492 P.3d 801 (quotation simplified).

night to get food. Suhail asked her to give him a ride to Victim's apartment, and she dropped him off at Victim's around 10:20 p.m.

¶5 Victim's friend (Friend) was at Victim's apartment when Suhail arrived. Suhail and Victim went into a separate room and spoke privately for about five minutes. During that conversation, Suhail bought a pill from Victim for $20. Victim also "fronted" Suhail a second pill.[2] After getting the pills, Suhail left Victim's apartment and went to a hookah lounge; while there, he borrowed $20 from somebody so that he could pay Victim back for the fronted pill.

¶6 After Suhail left Victim's apartment, Friend took Victim to a nearby gas station for a soda. They then went back to Victim's apartment, after which Friend left. Around 11:20 p.m., Victim texted Friend, asking if he made it home. Meanwhile, Suhail headed back to Victim's apartment so that he could pay for the fronted pill. Around 11:30 p.m., one of Victim's customers (Customer) called Victim to see if he could come get pills. Victim replied that Customer needed to hurry because he had another customer coming. Customer drove to Victim's apartment, parked across the street, and tried to call Victim, who was no longer answering his phone. Customer sat in his car for 20 to 25 minutes before he received text messages from Victim. The texts—which started arriving at 12:22 a.m. on Friday—read, "I left I will be back in 30 minutes" and "Brotherdon'tcome."[3] Customer thought that this second text was odd because Victim couldn't spell very well

---

2. This use of "front" is commonly understood to mean "[t]o buy something for someone with anticipation of being paid back." *Front*, Urban Dictionary, https://www.urbandictionary.com/define.php?term=front [https://perma.cc/J7A3-LLMX].

3. With respect to these and the other texts recounted in this section, we've left the spelling and formatting unaltered from the originals.

in English, so he typically used the voice-to-text feature when sending text messages. But the "Brotherdon'tcome" message was oddly spaced, indicating to Customer that it had been typed manually and not with the voice-to-text feature. Moreover, Victim didn't send text messages very often; he would usually just text "Call me" and then have a phone conversation.

¶7　Customer replied quickly to Victim's text messages and then waited for a response. About 20 minutes later, Victim texted back, saying that he had walked to a nearby gas station and asking Customer to meet him there. Customer thought this was a bit unusual because Victim usually didn't walk places, but he headed to the gas station anyway. After waiting awhile, he realized Victim wasn't there, so he texted Victim and asked if he was at the gas station. Victim replied, "Yes cine," and "Are u comeing," but Customer waited for about 15 minutes and never saw him. Customer then drove back to Victim's apartment and again parked across the street.

¶8　While sitting in his car, Customer looked at Victim's apartment and saw Suhail "coming out of the door." Suhail "shut the door behind him and just looked left and right and then walked off at a fast pace." Suhail was wearing "a hoodie" and "red shoes."[4]

¶9　Shortly after observing Suhail leave Victim's apartment, Customer received a phone call from Suhail. During their

---

4. At trial, the detective assigned to the case (Detective) testified that Customer told law enforcement that Suhail's shoes were "[r]ed tennis shoes" and "probably Wal-Mart [brand] or something." Also at trial, Customer said that Suhail's shoes were "[s]imilar to" Vans. The record, however, is somewhat unclear about whether Customer meant he had seen Suhail wearing Vans before the night of Victim's death or whether he meant that Suhail was wearing Vans that night.

conversation, Customer told Suhail that he thought he saw him at Victim's and asked if Suhail had any pills. Customer was hoping to get pills from Suhail since Victim wasn't answering his phone. Suhail told Customer that he had been at home and that he wasn't the person that Customer saw. But Suhail said he had pills, and the two men arranged to meet up "[l]ater that same day" so that Customer could get the pills. Customer went home and tried calling Victim a few more times, but he eventually gave up because Victim was not answering.

¶10　That same morning—Friday, December 9—Suhail called Ex-Girlfriend at 7:09 a.m. They agreed to meet up that day so that Suhail could give Ex-Girlfriend some money and other items for Child. Ex-Girlfriend went to work, and during her lunch break she met up with Suhail. She took him to pay some of his bills, and they went to the Restaurant, where he gave her approximately $200. Sometime that day, Suhail also gave Child a computer tablet, a baseball bat, and a baseball glove.

¶11　Ex-Girlfriend believed that Suhail had money because he sold a car (a Mercedes, possibly), but she didn't know any details about the sale, such as who bought the car, how much it sold for, or when the sale occurred.[5] While they were together that day, she also thought that Suhail was "out of it" and seemed "like a zombie." Suhail was "stooped over," "had difficulty walking," "couldn't keep his eyes open[]," and was "slurr[ing] his words." Ex-Girlfriend believed that he was high—"[h]igher than [she'd] seen him before"—and asked him what was going on. He said that he hadn't slept. Girlfriend also noticed what looked like a

---

5. At trial, Friend testified that he bought a Mercedes from Suhail "either a month or a couple of weeks" before Victim's death. He thought he paid Suhail $1,500 or $1,700 for it.

"hickey" on Suhail's neck. When she asked him about it, he "said that he had got [it] in a fight."[6]

¶12　That day, Suhail bought new clothing, including a new coat and boots. Suhail went to other stores that day too and made several purchases, paying with cash each time. Around 9:00 or 10:00 a.m., Suhail went to a smokeshop and bought cigarettes. He asked the employee working the front counter (Employee) when the store's owner (Owner) would be in. Suhail wanted to talk to Owner about purchasing a knife. That afternoon, Suhail came back to the shop and purchased a small "[s]port knife." Sometime during one of these visits to the smokeshop, Suhail asked Employee for change for a $100 bill.

¶13　Around 5:00 p.m., a woman called Friend and said Victim wasn't answering his door. Friend went to Victim's apartment and saw Victim's neighbor (Neighbor). Friend tried to open Victim's door, but it was locked. Neighbor, who was drunk, began yelling at Friend and telling him not to open the door. But Friend was worried about Victim, so he asked another neighbor to call the police. While they waited for the police, Neighbor suggested that they should try to open Victim's back door. Neighbor jumped over the fence into Victim's backyard and tried to push the door open. Neighbor then started screaming that Victim had been killed. Police soon arrived, and they had to force Victim's back door open because Victim's body was against the door.

¶14　Later that night, Ex-Girlfriend, Child, and Suhail went to the Restaurant to have dinner with some members of Suhail's family. Suhail's brother asked Ex-Girlfriend to run an errand for him; she agreed, and Suhail went with her. During this drive, Suhail had a phone conversation with somebody. Ex-Girlfriend

---

6. On cross-examination at trial, Ex-Girlfriend said she thought Suhail was lying when he said that he got the mark from a fight and that it wasn't a hickey.

didn't know what the conversation was about because Suhail was speaking Arabic, which she doesn't speak, but when the phone conversation ended, Suhail told her that Victim had been stabbed. The two also drove past Victim's apartment while they were out and saw several police officers outside. Suhail asked Ex-Girlfriend if she "would keep in contact with him if he were to get locked up for 25 years." This conversation started because she was "trying to encourage him to stop using drugs," but she still thought this question "was a little weird." Suhail also asked Ex-Girlfriend something like, "[D]o you think I would do that?" When the prosecutor (Prosecutor) asked her about this question at trial, she said that she thought that he was asking about Victim's murder.[7] When Suhail and Ex-Girlfriend completed the errand, Ex-Girlfriend took Suhail to his mother's apartment and then went home.

¶15 Later that night, Customer and Suhail met up. Customer bought two pills from Suhail, and they discussed Victim's death. Customer—who had previously gone to Victim's apartment and talked to the police when he found out what happened—was sad and upset. But Suhail seemed "very calm." Customer began to suspect that Suhail was involved in Victim's murder, so he confronted him. Suhail "arrogantly" denied any involvement and dismissed the confrontation as though Victim's death "wasn't an important subject to him."

---

7. On cross-examination at trial, Ex-Girlfriend agreed that the conversation about Suhail's drug use started before they saw the police. And she testified that she couldn't remember whether the question came before or after seeing the police. But on redirect, Prosecutor directed Ex-Girlfriend to review the transcript of her preliminary hearing testimony, and she clarified that Suhail made the comment as they were driving past Victim's apartment.

*The Investigation*

¶16    An autopsy later showed that Victim had been stabbed 39 times. And while police found a few knives in the apartment, none appeared to be the murder weapon. When the police searched Victim's apartment, they didn't find any pills or money, nor did they find Victim's wallet or phone.

¶17    One of the responding officers said there was "blood everywhere [he] looked." From this and other evidence at the scene, it looked to officers like there had been a fight. Also, based on how dry the blood was when Victim's body was discovered, officers believed that Victim likely died late on Thursday the 8th or early on Friday the 9th.

¶18    When the forensics unit used a chemical spray to look for shoeprints, they found two shoeprints in the apartment. One of the shoeprints matched Victim's shoes, but the police were not initially able to identify the shoes that made the second shoeprint. The forensics unit and police also attempted to collect fingerprint and DNA evidence, but these attempts were ultimately "[un]successful."

¶19    Officers also found a bottle of "red and gooey" liquid in Victim's kitchen. The liquid was pigeon food (Victim had a pigeon coop in his backyard), and the liquid was not only in the bottle, but also on the kitchen counter and "around the kitchen."

¶20    Law enforcement requested a "ping" of Victim's phone. At trial, there was testimony that a ping uses GPS technology and that it can narrow a phone's present location "down to 3 meters." When law enforcement pinged Victim's phone on December 10th, it was in Ammon, Idaho. Victim's phone made a call in Ammon and then went dead. An Idaho sheriff's department went to the

location of the ping and found five parked cars with Utah license plates.[8]

¶21 Within a week, Suhail was arrested on unrelated charges while riding in a friend's car. At the time of this arrest, Suhail was sitting in the front passenger seat, and police discovered 40 Xanax pills in the car door next to Suhail's seat. They also found a "handful of receipts" in his "immediate personal space" and "over $1,000 on [his] person." The receipts were all from cash purchases that had been made after Victim's murder. The police also seized Suhail's phone.

¶22 Detective interviewed Suhail shortly after his arrest. The interview lasted seven hours, and Suhail appeared to be under the influence of drugs. Throughout the interview, Suhail denied having anything to do with Victim's murder. He claimed that on the night of the murder, he actually went to Victim's apartment at 7:00 p.m. (not later in the evening as other witnesses later testified), and that once there, he purchased one pill from Victim for $20 and that Victim fronted him a second pill. Suhail said he went to a hookah lounge next and borrowed $20 from somebody to pay for the pill Victim fronted him. Suhail said that around 10:00 p.m., he went back to Victim's to pay for the fronted pill, but that he left when Victim didn't answer the door. Suhail also claimed that he had cash on him when arrested because he sold a car to Friend.

¶23 After interviewing Suhail, Detective looked through Suhail's phone and discovered a photo that Suhail took of himself

---

8. No explanation was ever provided for why Victim's phone would be in Ammon, Idaho.

two months before Victim's death. In the photo, Suhail was wearing red Asics Gel Resolution 5 shoes.[9]

¶24 Detective also investigated Suhail's cell phone activity. This examination showed that at 11:05 and 11:06 p.m. on Thursday the 8th, Suhail called Neighbor, but the calls were very short, indicating to Detective that Neighbor didn't answer. The next activity recorded on Suhail's phone was an outgoing call to Customer at 1:04 a.m. on Friday the 9th. At 3:28 a.m., Suhail texted Victim asking if he could "please come get couple of them." Around 4:00 a.m., Suhail texted another drug dealer, "I have to sell thos 30s tall I get the 600$ do you want them g?" And at 6:47 a.m., Suhail texted the drug dealer again, saying, "Bro remember I have 240 30s in there and 80 zany." At trial, Detective testified that "30s" means "30-milligram oxycodone" and "zany" means "2 milligram[] Xani bars." For the next few hours, Suhail continued to text the drug dealer about "zany" and "30s."

¶25 Detective was also able to collect Suhail's and Victim's "call detail records," which he described as "a capture of what [a] cell phone does" and what phone towers it connects to and at what times. Detective explained that, in essence, the records can provide the "general location" of a phone, but unlike GPS technology, these records can't provide an exact location. Between midnight and 1:00 a.m., Victim's phone was in the general vicinity of his apartment. The phone turned off around 1:00 a.m., turned back on at 2:27 a.m., and received two text messages while it was in the general vicinity of Suhail's mother's apartment. As for Suhail's phone, until about 1:40 a.m., it appeared to be in the general vicinity of Victim's apartment. Starting around 1:40 a.m.,

---

9. Suhail reportedly lived with his mother, and law enforcement searched her apartment, as well as Suhail's brother's apartment, for Asics Gel Resolution 5 shoes. They never found that model of shoe.

Suhail's phone was connecting to towers in the general vicinity of his mother's apartment.

¶26  Based on the findings of its investigation, the State charged Suhail with murder, aggravated burglary, aggravated robbery, and obstructing justice.

*Suhail's Motion to Exclude*

¶27  Officers sent a photograph of the unidentified shoeprint from the crime scene to a forensic scientist (Technician) who specializes in "footwear examination." They asked her to identify the type of shoe that left the unidentified shoeprint. Technician ran the shoeprint through a database that stores numerous photographs of shoe outsole patterns.[10] Technician was unable to find a match in the database, but she did see Asics shoes in the database that had a similar outsole pattern. Because of this, she went to the Asics website, looked at its shoes, and determined that the shoeprint in question matched the outsole of the Asics Gel Resolution 5 shoe. She then submitted an initial report to law enforcement identifying that model of shoe as the likely creator of the shoeprint.

¶28  Technician also contacted Asics, and its representatives told her that the Asics Gel Resolution 5's outsole is unique to that model of shoe and that Asics does not license its outsole patterns to other companies. Asics also provided her with blueprints and diagrams for every size of Asics Gel Resolution 5 shoes that it manufactured. Using those blueprints, Technician estimated that the shoe responsible for creating the shoeprint was a men's size 9.5 to 11.5 or a women's size 11 to 12. But she was "[n]ot very"

---

10. A shoe's outsole is "[t]he exposed part of the sole that is [in] contact with the ground." *Anatomy of the Shoe*, Shoe Guide, https://www.shoeguide.org/shoe_anatomy/ [https://perma.cc/T2 4Z-MHHA].

confident in this estimate because she had "no knowledge" or "experience" in making size estimates. Moreover, the blueprints were two-dimensional, while the shoeprint was three-dimensional and created by a shoe in motion.

¶29 The State acquired two pairs of Asics Gel Resolution 5 shoes—a size 14 and a size 10—and sent them to Technician for comparison. The shoes were not marked as men's or women's shoes. Unbeknownst to Technician, the size 10 was a women's size 10. Technician concluded that neither of these shoe sizes matched the size of the shoe that made the shoeprint at the scene.

¶30 Before trial, Suhail's counsel (Counsel) moved to "exclude any bloody footprint evidence." Counsel explained that the State was seeking

> to admit evidence that (1) a partial bloody footprint was found at the scene of the homicide; (2) an expert will testify that the shoe that made the partial bloody shoeprint at the scene was [a] men's size 9.5 to an 11;[11] (3) the expert will testify that the shoe print tread belongs to an ASICS running shoe; (4) Mr. Suhail was seen . . . wearing an ASICS shoe that has a similar tread to the shoe print found at the scene of the homicide[;] and that (5) Mr. Suhail's shoe size is a men's size 8.[12]

---

11. Although Suhail's motion stated the estimated size range was "9.5 to an 11," Technician's testimony at trial was that the shoes were size 9.5 to 11.5.

12. From the record, it is not clear when Technician compared the size 14 and size 10 shoes to the shoeprint. Because Suhail's motion to exclude did not mention these example shoes, it appears that

(continued…)

¶31    Counsel argued that this evidence should be excluded as irrelevant under rule 401 of the Utah Rules of Evidence because there was no "connection between the shoe prints found at the scene and the shoes owned by" Suhail. Counsel further argued that although Technician matched the shoeprint's outsole to a model of shoe that Suhail owned, Suhail's shoe size (men's 8) was much smaller than Technician's estimated size range (men's 9.5 to 11.5). According to Counsel, this made Technician's testimony irrelevant because Suhail could not have created the shoeprint at the scene.

¶32    Alternatively, Counsel argued that the evidence should be excluded under rule 403 of the Utah Rules of Evidence. He contended that the jury would be confused and misled if the State was allowed to present evidence that Suhail owned the same model of shoe that left the shoeprint at the scene, despite its "own expert's testimony that the print belonged to a much larger shoe."

¶33    In its opposing memorandum, the State clarified that it did not intend to ask Technician "to testify as an expert in calculating shoe sizes from footwear impressions." It further clarified that Technician was "neither trained nor certified in this area" and that her size estimates "would likely not meet the standards of rule 702." *See* Utah R. Evid. 702. But in citing *State v. Yalowski*, 2017 UT App 177, 404 P.3d 53, the State argued that Technician's outsole comparison was admissible as lay testimony under rule 701 of the Utah Rules of Evidence. *See id.* ¶¶ 32–39 (holding that a forensic technician's outsole comparison "was proper opinion testimony under rule 701").

¶34    At a hearing on the motion to exclude, Prosecutor stated that Technician was not qualified to offer an opinion on the size of shoe that left the shoeprint. Prosecutor also explained that the

---

Counsel did not know about the comparison or that the comparison had not yet occurred.

State had an example size 14 pair of Asics Gel Resolution 5 shoes. And later in the hearing, he referenced a second pair of example shoes, which he thought were "perhaps" a men's size 8.5. Prosecutor did not otherwise elaborate on these example shoes or discuss Technician's conclusions about them. But Prosecutor did clarify that the State was intending to introduce those example shoes at trial so that the jury could examine their outsoles.

¶35 In response, Counsel argued that if Technician was a lay witness, she shouldn't be able to testify about information she learned from Asics, such as how it doesn't license its designs to other companies. *See* Utah R. Evid. 701 (stating that opinion testimony by a lay witness must be "rationally based on the witness's perception"). The court asked Prosecutor how he intended to admit Technician's testimony that Asics told her that it doesn't "license the [outsole] design to anybody else and it was only used on that particular model of shoe." Prosecutor responded that he was "not strongly inclined to try to go that avenue."

¶36 In the alternative, Counsel argued that if Technician was ultimately allowed to testify about her outsole comparison, he should then be allowed to ask her about her size estimates. Counsel explained that he wanted to argue that Suhail wore a men's size 8, which fell outside Technician's estimated size range. The court responded, "I suppose you can do what you want with it."

¶37 The court denied Suhail's motion to exclude. It stated that the "evidence is sort of functionally equivalent to the evidence that the court in *Yalowski* said was admissible under [rule] 701." When Counsel asked for clarification on what type of witness Technician would be, the court explained that she would "be offering lay opinion testimony."

### *The Trial*

¶38　The case proceeded to a five-day jury trial. The State called an officer who responded to the crime scene, Ex-Girlfriend, Friend, Technician, Customer, Employee, Neighbor's wife, Detective, and Owner. The witnesses testified to the events as explained above. Below, we elaborate on three additional aspects of the trial that are relevant to this appeal.

### *1. Shoeprint Evidence*

¶39　After jury selection, the parties asked the court to clarify its earlier ruling on Suhail's motion to exclude the shoeprint evidence. The State believed that Technician was allowed to testify that the shoeprint from the crime scene matched the outsole of the Asics Gel Resolution 5 (i.e., the outsole comparison) but that she was *not* allowed to testify about her size estimates. Counsel, however, thought he was allowed to bring up the size estimates in cross-examination. The court told the parties it would review the hearing transcript and resolve the dispute before Technician testified.[13]

¶40　The following day, the attorneys and the court again discussed Technician's testimony. The court referred to Technician as "the expert, the 701 expert, the lay expert." Prosecutor stated that Technician would be "testifying as an expert in the area of . . . footwear impression examination." But he argued that she wasn't qualified to testify about the size estimates, so he asked that any substantive evidence about the size be prohibited. And he also anticipated Technician being able to testify that she received two example shoes: "a men's size fourteen and a men's size eight and a half." Counsel pushed back,

---

13. The hearing on Suhail's motion to exclude was in August 2019. The trial was in November 2019, meaning there was about a three-month gap between the court's initial ruling and trial.

however, arguing that the State had presented Technician as a lay witness, not an expert witness, and as a result, Technician was not allowed to "rely on information given to her by [Asics] because that would be hearsay since she's not a 702 expert." He also argued that the State shouldn't be allowed to present only the favorable aspects of Technician's findings. Because Technician estimated that the shoeprint was made by a men's size 9.5 to 11.5 shoe, Counsel intended to introduce evidence that Suhail wore a size 8 and then argue that by Technician's own estimates, Suhail could not have created the shoeprint. At the close of this discussion, the court ruled that Counsel could ask Technician about the size estimates.

¶41 After this clarification and ruling, Technician testified, and she started by describing how she makes outsole comparisons. As Technician was explaining how she uses a database to find potential matches, Counsel objected. In a sidebar discussion, Counsel argued that the State's position had been that Technician was a lay witness and not an expert witness and that Technician should therefore not be allowed to testify about the database because it was hearsay. Prosecutor responded that Technician was "an expert in latent print examination" but was not an expert in "size estimation." The court asked if Technician was disclosed before trial as an expert witness, and Prosecutor responded, "Yes." Counsel did not affirm or deny Prosecutor's representation, but he continued to argue that the State had always said that Technician was a lay witness. The court appeared to agree with Prosecutor, and it overruled Counsel's objection.

¶42 Technician then explained how she made the outsole comparison. She also stated that she didn't find any other model of shoe that had a matching outsole to that of the shoeprint. And she further testified that Asics representatives had told her that Asics does not license its shoe molds to other companies and that the outsole of the Asics Gel Resolution 5 is unique to that model

of shoe. Counsel did not object to Technician's testimony that Asics does not sell its shoe molds.

¶43 Prosecutor then asked Technician about the size estimates. She explained that Asics sent her blueprints for every size of Asics Gel Resolution 5 shoes that it manufactured. Using those blueprints, she said that the shoe responsible for creating the shoeprint at the scene "could potentially be" a men's size 9.5 to 11.5 or a women's size 11 to 12. But Technician said she was "[n]ot very" confident in this estimation. This was because she had "never looked at blueprints from shoes before." Moreover, she explained that it's difficult to compare a two-dimensional blueprint to a three-dimensional shoeprint because a blueprint is "flatter and larger" and contains the "entire outsole and the sides" of the shoe, whereas the actual outsole "roll[s] up" the sides of the shoe.

¶44 The State admitted the example Asics Gel Resolution 5 shoes into evidence, and Technician testified that neither shoe size made the impression at the scene. She explained that the size 14 shoes were "extremely large and could completely be eliminated, but the [size 10 shoes] were closer to the relative size of the shoe impressions found at the scene." Prosecutor asked her if the size 10 shoes were larger or smaller than the shoeprint at the scene, but Technician said it was "really hard for [her] to say definitively" and that she didn't "know either way." But Prosecutor pressed her for an answer, and she said that the shoeprint "looked slightly larger than" the size 10 shoes.

¶45 The example shoes were labeled as size 14 and size 10, and they were not labeled as men's or women's shoes. Technician stated that she did not know if the shoes were men's or women's shoes. But she testified that a women's shoe is typically one and a half numerical sizes larger than a men's shoe of the same actual size. So, for example, a women's size 10 is the equivalent of a men's size 8.5.

¶46    On cross-examination, Counsel asked Technician if she was "told that [Suhail] wore a size eight." Technician replied, "I was never told anything about what the defendant wore." Counsel also asked Technician to confirm her earlier testimony that the shoeprint from the scene looked "slightly larger" than the size 10 shoe. Technician responded, "It might have been, yeah." Counsel then asked, "Would you agree that a size eight is substantially smaller?" Technician said, "Yes," and at this point Prosecutor asked to approach the bench. The parties approached, and Prosecutor informed the court and Counsel that the size 10 shoe was a women's size 10, meaning it was a men's size 8.5. Counsel told the court that he didn't know it was a women's shoe and that he had never received Technician's report on the size 10 shoe. Counsel described the situation as "an ambush" and "a due process violation." He said that if he had known that the shoes were a men's size 8.5, he wouldn't have stipulated to them being introduced as evidence. Because Technician didn't know if the shoes were men's or women's shoes, the court decided to allow her to finish her testimony and then discuss the matter further.

¶47    Counsel continued the cross-examination, and he asked Technician whether shoes are ever counterfeited. She said that they are, but it's mostly "higher-end shoes, like Air Force 1s, Michael Jordan shoes." Counsel also asked her what she told the State about her qualifications to "make a size analysis or a size comparison." She responded, "I told them I had no knowledge and no experience and that I shouldn't be making a qualification . . . ." When Counsel brought up the size estimates, Technician said, "I—again, on that, it was me guessing from the blueprints. It was a complete guess. I don't know what size these shoes made from the blueprints. I don't have a clue."

¶48    After Technician testified, Counsel moved to exclude the example shoes that the State admitted as evidence. He explained that he hadn't received a report about the shoes and that he hadn't objected before because he thought when they were introduced as

size 10 shoes, they were *men's* size 10 shoes. The court pointed out that Technician only testified about the size estimates because Counsel argued that he should be allowed to cross-examine her about them, but Counsel explained that he took that path without knowing that the size 10 shoes were women's shoes. Prosecutor, however, argued that the court and the attorneys would be misleading the jury if they didn't inform the jury that the shoes were women's shoes, and the court pointed out that if the shoes didn't go to the deliberation room with the rest of the evidence, the jury would want to know where they were. The court decided to take the matter under advisement.

¶49     The next day, the parties and the court again discussed the shoeprint evidence. The court first made a finding that "the confusion that developed was not the result of any kind of effort by anyone involved, any of the lawyers or the witness[,] to in any way attempt to mislead the tribunal or somehow present evidence to the tribunal that was not understood by everybody involved." It further stated, "[T]o the extent it was a mistake, it was an innocent one."

¶50     The court also said that it wasn't clear what disclosures the State had made regarding Technician's work and planned testimony. But the court then noted that at the hearing on the motion to exclude, Prosecutor had mentioned "a men's size eight-and-a-half shoe, . . . [s]o that issue was at least out there." And to the extent that the State did not disclose more detailed information about the size estimates, the court concluded that was "understandable under the circumstances since the State's position going into this was that [it was] not going to introduce evidence of the shoe size."

¶51     The court accordingly ruled that it would allow the State to present evidence that the size 10 shoes were a women's size 10. And it denied Counsel's motion to exclude the example shoes. But

it also ruled that that the State could not present evidence of Suhail's shoe size.

¶52     Counsel asked for a mistrial based on the State's failure to disclose. He explained that there was never any disclosure about the size 10 shoe and that his strategy would have been different had he known that the size 10 shoes were women's shoes. As part of his argument, he contended that there was not "any foundation saying this is a [women's] size 10." The court denied Counsel's motion for a mistrial.

¶53     When Detective testified, Prosecutor asked him if he made "any efforts to find a pair of shoes to use for comparison." Detective affirmed that he had and explained that it was difficult to find Asics Gel Resolution 5 shoes because they weren't sold anymore. Prosecutor asked to approach, and at a sidebar, he asked the court if he could ask Detective what size the example shoes were. The court said, "Well, you can ask him what size he ordered." When the direct examination resumed, Prosecutor asked Detective if he knew what size the size 10 shoes were. Detective responded, "10 women's, eight-and-a-half men's." Counsel did not object to this statement.

### 2. Detective's Other Testimony

¶54     During direct examination, Prosecutor asked Detective, "In general[,] and putting aside the defendant, did any of the people that you spoke with provide you with any information, evidence, eyewitness evidence that contradicted the testimony that's been presented by the witness[es] so far?" Counsel objected, arguing that the question called for a conclusion and bolstering. The court asked Prosecutor to repeat the question, which he did, and the parties approached the bench for a sidebar. Counsel argued that in addition to calling for bolstering, the question was "not relevant" and "prejudicial." The court overruled Counsel's objection, and Prosecutor asked Detective, "[D]uring your

investigation did you uncover any evidence that contra[dicted] the testimony given by the witnesses?" Detective replied, "No."

¶55 When Counsel cross-examined Detective, they had the following exchange:

> Q. [Y]ou were asked if there was any evidence that contradicted the testimony of witnesses, but you were here when [Customer] changed his story several times, correct?
>
> A. I was.
>
> Q. And you also, yourself heard, when [Friend] said 10:00, but you put down in your police report 7:00, correct?
>
> A. I did.
>
> Q. So there was evidence that things contradicted, correct?
>
> A. There is.

¶56 Counsel also cross-examined Detective about the red pigeon food that was found in Victim's apartment. Detective agreed that to feed the pigeons, somebody would need to grab the bottle of food from the kitchen and walk to the coop in the backyard, which would take the person through the area where Victim's body was found. While Detective agreed with Counsel that it was "possible" that the shoeprint found at the scene was made before the murder and in pigeon food, not blood, Detective then explained the "reason [he] would say no" to that theory was that the pigeon food was "really sticky" and "where there was pigeon food, there was dog hair caked to it." But there wasn't any dog hair caked to the

shoeprint. Detective did acknowledge, however, that the hair "could have been scraped off" the shoeprint.

### 3. Defense Witness

¶57 Suhail elected not to testify in his own defense. He presented testimony from just one witness—a private investigator (Investigator) who reviewed police reports about Neighbor. She testified about three incidents involving Neighbor. First, in February 2019, Neighbor chased his neighbor with a knife and then stabbed a different man who was getting into his car parked outside Neighbor's apartment. Second, that same night, law enforcement received a call saying that Neighbor was "knocking on the front door of a residence holding an ax handle and asking if the resident had anything, and smiling in a very strange way." And third, about a month later, Neighbor stabbed a car's dashboard with a knife because he was angry with the driver.

### 4. Closing Arguments

¶58 During his closing argument, Prosecutor argued that the shoeprint from the crime scene was made in blood and not pigeon food. He stated,

> I want to go back to the scene photographs, there was a lot of discussion about this chicken feed bullshit. There was no evidence, and there's nothing in the evidence to suggest that [Victim] spilled a gallon of chicken food on the floor, collapsed, and that the blood then somehow mingled with that, was then smeared around and that the chicken food was what created the footprints in the floor.

Counsel did not object to Prosecutor's reference to "chicken feed bullshit."[14]

¶59 Prosecutor also discussed Suhail's question to Ex-Girlfriend about whether she would "keep in contact with him if he were to get locked up for 25 years." Prosecutor apparently wanted the jury to surmise that Suhail was talking about a sentence from a potential murder conviction and not about one stemming from his drug use. In an apparent attempt to head off another potential response from the defense, Prosecutor then pointed out that Customer had admitted he was on probation for robbery. Counsel objected, asserting that this argument was misleading because there wasn't any evidence about what a sentence for robbery is, but the court overruled the objection. Prosecutor then stated, "Twenty-five years isn't—isn't a drug time, it's not robbery time; it's murder time." Counsel objected, and this time the court sustained the objection. The court then instructed the jury to "[d]isregard the statement about the number of years."

¶60 Prosecutor also emphasized evidence that supported the State's theory that Suhail murdered Victim. For example, he reminded the jury that when officers searched Victim's apartment, they did not find cash, pills, or Victim's phone. And he described how before Victim's death, Suhail had no money and no pills, but after Victim's death, he was trying to sell pills, made several cash purchases, and gave $200 in cash to Ex-Girlfriend. From these facts, Prosecutor argued that Suhail murdered Victim and then stole his pills and money. Prosecutor also discussed Detective's testimony about the cell phone records and Technician's outsole comparison, among other evidence.

---

14. Although Prosecutor said "chicken feed," it seems apparent from the context of the evidence that he was referring to the pigeon food.

¶61     When Prosecutor finished his closing, Counsel moved "for a mistrial for prosecutorial misconduct about the 25 years as prison . . . time for murder." In the alternative, he asked for a jury instruction "[t]hat the sentence for murder is not 25 years." The court denied the motion for a mistrial but said it would "instruct the jury [that] the sentence for murder is not 25 years." Counsel, however, wanted the instruction to say that the sentence for murder is "up to life." The court instructed the jury "that the sentence for murder is not[,] under the law, 25 years."

¶62     During his closing, Counsel argued that Suhail had money not because he stole from Victim but because he sold a car to Friend. He also emphasized Customer's testimony that the shoes he saw Suhail wearing the night of Victim's death were "Van-like" and not tennis shoes. He also pointed out that it was odd that Victim's phone pinged in Ammon, Idaho, and posited that the murderer could have "taken it up there." And he then argued that Neighbor was the murderer, not Suhail. As part of this argument, he reiterated Investigator's testimony about how Neighbor chased his neighbor with a knife, ended up stabbing someone else, and then, at a later date, also stabbed a car dashboard after getting angry at the driver. He also pointed out that Neighbor acted erratically when he found Victim's body and argued that because Neighbor lived next door, he could have killed Victim and then easily gone home to wash off the blood. Moreover, he reminded the jury that one of Victim's neighbors spoke with Suhail shortly after the murder and didn't report anything about seeing blood on him. Counsel argued that it would have been difficult for Suhail to stab Victim without getting blood on himself, especially given how much blood there was at the crime scene. And he reminded the jury that Suhail maintained his innocence during a seven-hour interview where he was lied to by police officers and under the influence of drugs.

¶63     After deliberations, the jury convicted Suhail on all charges.

*Motion for New Trial*

¶64    Suhail later moved for a new trial. He argued that Prosecutor committed prosecutorial misconduct in his closing statement by (1) stating that 25 years is "murder time" and (2) calling the defense argument about the pigeon food "bullshit." Suhail also argued that he was entitled to a new trial because the State failed to disclose Technician's report and failed to file notice that it was calling Technician as an expert. Suhail contended that these failures amounted to a misrepresentation of the nature of Technician's testimony and thus resulted in an unfair trial.

¶65    The court denied Suhail's motion "for the reasons articulated by the court on the record at the time it ruled on each of the issues identified." As to Suhail's claims that hadn't been raised before, the court "decline[d] to consider such issues on the merits in the context of a motion for [a] new trial."

¶66    Suhail now appeals his convictions.

ISSUES AND STANDARDS OF REVIEW

¶67    On appeal, Suhail raises six claims regarding the shoeprint evidence.

¶68    First, Suhail argues that the district court erred when it denied his motion to exclude Technician's outsole comparison. We review a district court's evidentiary rulings for an abuse of discretion. *See State v. Alzaga*, 2015 UT App 133, ¶ 31, 352 P.3d 107.

¶69    Second, he argues that Detective's testimony that the size 10 shoes were women's shoes lacked foundation and that the court thus erred by allowing it. As explained below, this issue was not preserved, so Suhail must show plain error to prevail on appeal. "To demonstrate plain error, a defendant must establish

that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *State v. Johnson*, 2017 UT 76, ¶ 20, 416 P.3d 443 (quotation simplified).

¶70    Third, Suhail contends that the State violated the Expert Notice Statute with respect to Technician's testimony and that the court erred by not striking her testimony, granting a mistrial, or granting a new trial. "The correct standard of review for a trial court's decision to admit or exclude expert witness testimony is abuse of discretion." *State v. Peraza*, 2020 UT 48, ¶ 33 n.6, 469 P.3d 1023 (quotation simplified).

> Because a district judge is in an advantaged position to determine the impact of courtroom events on the total proceedings, once a district court has exercised its discretion and denied a motion for a mistrial, we will not reverse the court's decision unless it is plainly wrong in that the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial.

*State v. Allen*, 2005 UT 11, ¶ 39, 108 P.3d 730 (quotation simplified). Similarly, "[w]e will not reverse a trial court's denial of a motion for a new trial absent a clear abuse of discretion." *State v. Maestas*, 2012 UT 46, ¶ 103, 299 P.3d 892.

¶71    Fourth, he argues that the State violated rule 16 of the Utah Rules of Criminal Procedure with respect to Technician's testimony and that the court erred by not striking her testimony, granting a mistrial, or granting a new trial. If a district court denies relief requested under rule 16, we review that denial for an abuse of discretion. *See State v. Knight*, 734 P.2d 913, 918 (Utah 1987).

¶72    Fifth, Suhail contends that if we reject the arguments outlined above, Counsel was constitutionally ineffective for not

sufficiently investigating Technician's testimony. "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *State v. Lopez-Gonzalez*, 2020 UT App 15, ¶ 17, 459 P.3d 1049 (quotation simplified).

¶73 Sixth, Suhail requests—as an alternative to the above arguments—that we remand his case under rule 23B of the Utah Rules of Appellate Procedure for entry of findings of fact to support an argument that Counsel was constitutionally ineffective for not presenting evidence of Neighbor's shoe size. A rule 23B remand is "available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." Utah R. App. P. 23B(a).

¶74 Suhail also raises a number of claims that are separate from the shoeprint evidence. With respect to these, Suhail first argues that the court erred when it allowed Detective to testify that the evidence did not contradict the State's witnesses. We review the district court's decision to admit evidence for an abuse of discretion. *See Alzaga*, 2015 UT App 133, ¶ 31.

¶75 Suhail next contends that there were two incidents of prosecutorial misconduct in Prosecutor's closing statement: (1) the comment that 25 years was not "murder time" and (2) the "chicken feed bullshit" comment. Suhail argues that the court erred by not granting a mistrial or a new trial in response to these comments. We review claims relevant to the "murder time" comment for an abuse of discretion. *See State v. Harmon*, 956 P.2d 262, 276 (Utah 1998) ("Because a trial court is in the best position to determine an alleged error's impact on the proceedings, we will not reverse a trial court's denial of a mistrial motion based on prosecutorial misconduct absent an abuse of discretion."); *see also Maestas*, 2012 UT 46, ¶ 103. Because Suhail's arguments with respect to the "chicken feed bullshit" comment were not

preserved, we review that claim for plain error. *See Johnson*, 2017 UT 76, ¶ 20.

¶76 And finally, Suhail argues that the cumulative effect of these errors requires reversal. "Under the cumulative error doctrine, we apply the standard of review applicable to each underlying claim or error and reverse only if the cumulative effect of multiple errors undermines our confidence that a fair trial was had." *State v. White*, 2016 UT App 241, ¶ 14, 391 P.3d 311 (quotation simplified).

## ANALYSIS

### I. Shoeprint Evidence

¶77 As noted, Suhail raises several claims regarding the shoeprint evidence. We address each in turn.

A.  Motion to Exclude

¶78 Suhail first argues that Technician's outsole comparison violated rules 401 and 403 of the Utah Rules of Evidence and that the district court abused its discretion by denying his motion to exclude.[15] We disagree.

1.  Rule 401

¶79 "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence;

---

15. Because the State did not initially intend to admit the size estimates, the court's ruling on Suhail's initial motion to exclude was that the outsole comparison was admissible. Only later did the court rule that the size estimates were admissible, and it did so based on Counsel's arguments that he should be able to cross-examine Technician about the size estimates.

and (b) the fact is of consequence in determining the action." Utah R. Evid. 401. Put differently, evidence is relevant if it "has any tendency to prove or disprove the existence of any material fact." *State v. Colwell*, 2000 UT 8, ¶ 27, 994 P.2d 177. If evidence is relevant, it is admissible unless the U.S. Constitution, Utah Constitution, a statute, or applicable rules provide otherwise. *See* Utah R. Evid. 402.

¶80 Technician testified that she matched the unidentified shoeprint from the crime scene to the outsole of the Asics Gel Resolution 5 shoe—a specific shoe from a particular shoe company. The State later presented evidence that Suhail owned a pair of Asics Gel Resolution 5 shoes. Accordingly, Technician's testimony tended to make it more probable that Suhail left the shoeprint at the crime scene. *See id.* R. 401. And whether Suhail left the shoeprint at the crime scene was, of course, of some "consequence [to] determining" whether Suhail murdered Victim. *See id.*

¶81 Suhail, however, contends that the testimony was irrelevant because the State couldn't show that the shoeprint matched Suhail's actual shoes, the State couldn't show that the shoeprint matched Suhail's shoe size, and Customer testified that he saw Suhail wearing shoes "[s]imilar to" Vans—not Asics shoes—the night of the murder. True, these are all potential weaknesses in this evidence, and Suhail is thus essentially arguing that Technician's testimony could have been stronger. But the "standard for determining the relevancy of the evidence is very low, and even evidence with the slightest probative value is relevant." *State v. Smedley*, 2003 UT App 79, ¶ 15, 67 P.3d 1005 (quotation simplified). We also disagree with Suhail's assertion that Technician's testimony was irrelevant because the State couldn't show that shoeprints "corresponded to Suhail's shoes" and matched his shoe size. Technician's testimony might have been stronger had she been able to examine Suhail's shoes and provide a reliable size estimate. But that doesn't mean her

testimony was irrelevant without those components. Again, the standard is whether the evidence has "any tendency" to make a material fact "more or less probable." Utah R. Evid. 401. Because Technician's testimony had at least some tendency to make it more likely that Suhail murdered Victim, it was sufficiently relevant to pass rule 401's low threshold, and the identified arguments about the potential shortcomings of her testimony were properly left for jury consideration. *See State v. Wall*, 2020 UT App 36, ¶ 53, 460 P.3d 1058 ("When the evidence presented is conflicting or disputed, the jury serves as the exclusive judge of both the credibility of witnesses and the weight to be given particular evidence." (quotation simplified)); *see also* R. Collin Mangrum & Dee Benson, *Mangrum & Benson on Utah Evidence* 161 (2020–2021 ed.) (explaining that "the weight to be given any item of evidence and the conclusions to be drawn from the evidence in totality are jury questions that arise once the court determines the threshold question of relevancy and sufficiency").

¶82 The court did not abuse its discretion by ruling that the outsole comparison was relevant.

2.    Rule 403

¶83 Even if evidence is relevant, the court may exclude it "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Utah R. Evid. 403. Suhail argues that the outsole comparison should have been excluded under this rule because the fact "that the [shoeprints] might have been made by shoes of the same brand and model as a pair believed to have been worn—months ago—by Suhail was less probative than prejudicial." Suhail further argues that the testimony "likely confused and misled the jury into speculating that Suhail's size-8's could have left the larger-sized [shoeprints]." We disagree.

¶84 As explained above, Technician's testimony was probative because it tended to make it more probable that Suhail murdered Victim. Suhail's complaints about her testimony—namely, that the State didn't find Asics Gel Resolution 5 shoes in Suhail's possession and didn't have definitive testimony about the size of the shoeprint—don't demonstrate that the probative value of her testimony was "substantially outweighed" by a danger of unfair prejudice, confusion, or misleading the jury. *See id.*

¶85 "Because all effective evidence is prejudicial in the sense of being damaging to the party against whom it is offered, rule 403 does not require a court to exclude all prejudicial evidence." *Anderson-Wallace v. Rusk*, 2021 UT App 10, ¶ 18, 482 P.3d 822 (quotation simplified). "The type of prejudicial evidence that calls for exclusion is evidence that creates an undue tendency to suggest decision on an improper basis, commonly but not necessarily an emotional one, such as bias, sympathy, hatred, contempt, retribution or horror." *Id.* ¶ 23 (quotation simplified). Here, we are not persuaded that Technician's testimony created "an undue tendency to suggest decision on an improper basis." *Id.* (quotation simplified). Technician explained her background and qualifications to the jury, outlined how she identified the shoe in this case, and informed the jury that there were limitations to her size testimony. The State then used this testimony to argue that Suhail left the shoeprint at the crime scene because he owned Asics Gel Resolution 5 shoes. Accordingly, Technician's testimony was "highly probative of the very questions the jury was required to decide." *Id.* ¶ 24. And "[w]here evidence is undeniably probative of the central issue in a case, the danger of *unfair* prejudice *substantially* outweighing the probative value of the evidence is low." *Id.* (emphasis in original). Because Technician's testimony was "highly probative" of whether Suhail killed Victim, we are not convinced that it was so unfairly prejudicial that the district court abused its discretion by allowing the testimony. *See id.*

¶86    For similar reasons, we are unpersuaded that Technician's testimony created a meaningful danger of confusing or misleading the jury. The jury knew that the State never found Suhail's Asics Gel Resolution 5 shoes. It also knew that Technician's outsole comparison and size testimony were based on information she found on the Asics website, blueprints from Asics, and example shoes. And Technician testified several times that she was not confident in her size estimates. So the limitations that Suhail points to would have been evident to the jury, and we don't think there was any danger that the jury was confused or misled—or, at the very least, we don't think any potential danger substantially outweighed the probative value of Technician's testimony. *See* Utah. R. Evid. 403.

¶87    Because any potential danger from Technician's testimony was not "substantially outweighed" by the probative value of her testimony, the court did not abuse its discretion by ruling that the outsole comparison did not violate rule 403.

B.    Foundation for Detective's Testimony

¶88    Detective testified that the size 10 shoes that were used for size comparison were women's shoes. On appeal, Suhail argues that this testimony lacked foundation and was therefore inadmissible. We conclude that this argument was not preserved and that Suhail has not shown plain error.

¶89    "An issue is preserved for appeal when it has been presented to the district court in such a way that the court has an opportunity to rule on it." *State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443 (quotation simplified). "To provide the court with this opportunity, the issue must be specifically raised by the party asserting error, in a timely manner, and must be supported by evidence and relevant legal authority." *Id.* (quotation simplified).

¶90   When Detective testified that the size 10 shoes were women's shoes, Counsel did not object. As a result, Suhail's argument on appeal that this testimony lacked foundation was not raised below and is thus unpreserved. *See id.*

¶91   Suhail resists this conclusion, pointing to his argument in support of his mistrial motion. In that argument, which occurred before Detective testified, Counsel stated, "We are now without any foundation saying that is a [women's] size 10, so therefore it is a [men's] size eight-and-a-half . . . when we have no proof that it actually is a [men's] equivalent of a [men's] eight-and-a-half." But this was part of Counsel's argument about how the State's alleged lack of notice resulted in Suhail being ill-prepared to challenge Technician's testimony, and we accordingly understand this to have been an argument that there was no foundation for *Technician's* testimony that a women's size 10 shoe is the equivalent of a men's size 8.5 shoe. But because Detective testified after Technician, and because he did so based on his own knowledge, we don't think that this earlier argument from Counsel about the alleged lack of foundation for Technician's testimony provided the court with any opportunity to rule on whether there was a separate foundation for Detective's own testimony about this issue. *See id.* We thus conclude that this argument is unpreserved and that Suhail must show plain error to succeed on appeal.

¶92   "To demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *Id.* ¶ 20 (quotation simplified). "If any one of these requirements is not met, plain error is not established." *Id.* (quotation simplified). We conclude that Suhail has not shown plain error because he has not shown that Detective's testimony obviously lacked foundation.

¶93   Witness opinion testimony—whether lay or expert—must be based on proper foundation. *See* Utah R. Evid. 701–703. A lay

witness's opinion testimony must be "rationally based on the witness's perception" and cannot be "based on scientific, technical, or other specialized knowledge." *Id.* R. 701. Suhail argues that Detective's testimony lacked foundation "because the shoes themselves did not indicate whether they were men's or women's." But we don't think it would have been obvious to the district court that Detective's testimony was not "rationally based on [his] perception." *See id.*

¶94    Before Detective testified that the size 10 shoes were women's shoes, Prosecutor asked him, "Did you encounter any . . . difficulties in your efforts to obtain a pair of Asics gel resolution 5s?" Detective explained that it was difficult to find the shoes because "there's only two [that] existed." And when Prosecutor asked if the example shoes were purchased new or used, Detective explained that one pair was new and one pair was used. From the verbiage used in this exchange, it seems apparent that Detective had ordered the shoes himself. Because of this, it would have been likewise apparent that he was capable of testifying what sizes he had personally ordered. Indeed, at a sidebar conversation, the court told Prosecutor that he could ask Detective "what size he ordered," indicating that the court also understood Detective to be testifying about shoes that he had personally ordered. We accordingly don't think it was obvious that Detective's testimony that the size 10 shoes were women's shoes lacked foundation. The court therefore did not plainly err by not sua sponte interrupting Detective's testimony and requiring the State to lay more foundation on this point.[16]

_____

16. If Suhail is also challenging Detective's testimony that the women's size 10 shoes were the equivalent of men's size 8.5 shoes, we reject that argument for lack of prejudice. *See State v. Johnson*, 2017 UT 76, ¶ 20, 416 P.3d 443 (explaining that a defendant claiming plain error "must establish that . . . the error is harmful"

(continued…)

C.        Expert Notice Statute

¶95    Suhail argues that the State violated the Expert Notice Statute by not disclosing Technician as an expert or providing the results of her investigation. He further argues that the court should have responded to this alleged violation by striking "all shoe-related exhibits and Technician's testimony or grant[ing] Suhail's motions for mistrial and new trial." We reject Suhail's argument because, even if the State violated the Expert Notice Statute, Suhail has not shown that he is entitled to any of the remedies sought below or sought now on appeal.

¶96    The Expert Notice Statute establishes what notice parties to a criminal case must provide if they intend to call an expert witness. *See* Utah Code § 77-17-13(1). It also sets forth when the parties must provide "the results of any tests or other specialized data." *See id.* § 77-17-13(2). And of note here, the statute then outlines the available remedies if a party doesn't comply with the statute's requirements: "If the defendant or the prosecution fails to substantially comply with the requirements of this section, the opposing party shall, if necessary to prevent substantial prejudice, be entitled to a continuance of the trial or hearing sufficient to allow preparation to meet the testimony." *Id.* § 77-17-13(4)(a).

> If the court finds that the failure to comply with this section is the result of bad faith on the part of any party or attorney, the court shall impose appropriate sanctions. The remedy of exclusion of the expert's testimony will only apply if the court

(quotation simplified)). This is because Technician had already testified (with no objection) that women's shoes are about one-and-a-half sizes larger than men's shoes of the same actual size.

finds that a party deliberately violated the provisions of this section.

*Id.* § 77-17-13(4)(b).

¶97    Thus, by its plain terms, the Expert Notice Statute provides only two remedies: a continuance or, if the violation was the result of bad faith, "appropriate sanctions," and an order excluding evidence then requires a finding of a deliberate violation. *See id.* § 77-17-13(4)(a)–(b); *see also State v. Peraza*, 2020 UT 48, ¶ 36, 469 P.3d 1023 (stating that the "Expert Notice Statute prescribes two remedies" and then explaining when a continuance or exclusion are appropriate).

¶98    Suhail did not ask for a continuance below, and on appeal he has not asserted that he should have been given a continuance. So even if the State did violate the Expert Notice Statute, Suhail waived the remedy of a continuance because he did not ask for it. *See* Utah Code § 77-17-13(4)(a); *see also State v. Perez*, 2002 UT App 211, ¶ 41, 52 P.3d 451 (explaining that under Utah Code § 77-17-13(4)(a), the district court has no duty to grant a continuance that a party does not ask for).

¶99    Suhail did, however, request that Technician's testimony be excluded. But again, exclusion is available only when "the court finds that a party deliberately violated the" Expert Notice Statute. Utah Code § 77-17-13(4)(b). The court here did not make that finding. Rather, it found that "[t]o the extent the State did not disclose, it's understandable under the circumstances since the State's position" had been that it wouldn't introduce evidence about shoe size estimates. And regarding the size 10 shoes, the court found that any "confusion that developed was not the result of any kind of effort by anyone involved, any of the lawyers or the witness[,] to in any way attempt to mislead the tribunal or somehow present evidence to the tribunal that was not understood by everybody involved." Suhail has not challenged

these findings on appeal. And without a finding that the State "deliberately violated" the Expert Notice Statute, Suhail was not entitled to exclusion of Technician's testimony.

¶100 Thus, even if we assume the State violated the Expert Notice Statute, we cannot conclude that the court abused its discretion in denying him any relief based on this alleged violation because Suhail has not shown that he was entitled to any of the prescribed remedies.

D. Rule 16

¶101 Suhail argues that the State violated rule 16 of the Utah Rules of Criminal Procedure when it "failed to give the defense the complete results of Technician's investigation." And he again asserts that the district court should have responded to this alleged violation by striking "all shoe-related exhibits and Technician's testimony or grant[ing] Suhail's motions for mistrial and new trial."[17]

---

17. In conjunction with his arguments under the Expert Notice Statute, Suhail claims that the State's failure to disclose Technician as an expert violated rule 16 as well. But the text of the rule doesn't mention the word "expert," and Suhail points to no authority establishing that rule 16 creates expert notice requirements of its own. Moreover, in at least one case, we've suggested that the rule does not cover the ground that is otherwise occupied by the Expert Notice Statute. *See State v. Mills*, 2012 UT App 367, ¶ 28 n.8, 293 P.3d 1129.

That said, the rule does require the prosecution to provide a list of all persons the prosecution intends to call at trial. *See* Utah R. Crim. P. 16(a)(5). And it further requires, on a showing of good cause, the disclosure of any "item of evidence" that the court determines should be made available to allow the defendant "to

(continued…)

¶102  Rule 16(a) dictates what "material" and "information" a prosecutor must disclose to the defense in a criminal case, while

---

adequately prepare a defense." *Id.* R. 16(a)(4). Perhaps with these aspects of rule 16 in mind, our supreme court has recently suggested that the Expert Notice Statute and rule 16 currently function as "two sets of procedural rules running on parallel tracks." *State v. Peraza*, 2020 UT 48, ¶ 36 n.7, 469 P.3d 1023 (quotation simplified).

We need not resolve this potential conundrum here. Even if it's true that there is some implied expert disclosure component to rule 16 (which, again, we do not decide), we would resolve that aspect of Suhail's rule 16 argument for the same reason we resolve the others below: namely, Suhail was not prejudiced by any such violation.

We further note that in conjunction with his Expert Notice Statute and rule 16 arguments, Suhail also briefly references the Due Process Clause. "Under both the Utah and United States Constitutions, the prosecution bears a fundamental duty to disclose material, *exculpatory* evidence to the defense in criminal cases." *State v. Bisner*, 2001 UT 99, ¶ 32, 37 P.3d 1073 (emphasis added, quotation simplified). We don't see the relevance of the Due Process Clause to Suhail's claims because his assertion is that the shoeprint evidence was inculpatory, not exculpatory. *See State v. Rugebregt*, 965 P.2d 518, 522 (Utah 1998) (stating that because the evidence was inculpatory, not exculpatory, "the prosecutor's discovery duty was limited to disclosures under Rule 16"). But even if we considered Suhail's due process argument, we would reject it for the same reason that we reject his rule 16 argument— lack of prejudice. *See, e.g.*, *State v. Newton*, 2020 UT 24, ¶ 37, 466 P.3d 135 (rejecting a failure-to-disclose claim for lack of prejudice); *State v. McHugh*, 2011 UT App 62, ¶ 3, 250 P.3d 1006 (per curiam) (rejecting a *Brady*-based due process claim for lack of prejudice based on the "strength of the other evidence").

rule 16(b) sets forth the defense's disclosure obligations. *See* Utah R. Crim. P. 16(a)–(b).[18]

> If a party has failed to comply with this rule, the court may take one or more of the following actions: (A) order such party to permit the discovery or inspection, of the undisclosed material or information; (B) grant a continuance of the proceedings; (C) prohibit the party from introducing evidence not disclosed; or (D) order such other relief as the court deems just under the circumstances.

*Id.* R. 16(e)(1).

¶103   If we determine that a prosecutor violated these discovery rules, "the next question is whether the trial court erred in refusing to grant any of the relief sought by defense counsel." *State v. Knight*, 734 P.2d 913, 918 (Utah 1987). The district court errs if it abuses its discretion. *See id.* A court abuses its discretion "when, taking into account any remedial measures ordered by the trial court, the prejudice to the defendant still satisfies the standard for reversible error set forth in [rule 30 of the Utah Rules of Criminal Procedure], and the remedial measures requested but refused would have obviated this prejudice." *Id.*

¶104   Under rule 30, "an error warrants reversal only if a review of the record persuades the court that without the error there was a reasonable likelihood of a more favorable result for the defendant." *Id.* at 919 (quotation simplified). But in a failure-to-disclose scenario, there are "difficulties posed by the record's silence." *Id.* at 921. Accordingly, if a prosecutor fails to

---

18. Rule 16 was amended after Suhail's trial. Because those amendments do not affect our prejudice analysis, we cite the current version for the reader's convenience.

disclose and the defendant makes "a credible argument that the prosecutor's errors have impaired the defense, it is up to the State to persuade the court that there is no reasonable likelihood that absent the error, the outcome of trial would have been more favorable for the defendant." *Id.*

¶105   The bulk of Suhail's lack-of-notice argument is focused on the State's failure to inform him that the size 10 shoe used for comparison was a women's shoe, which meant that this shoe was much closer to Suhail's shoe size than Counsel realized.

¶106   For purposes of this issue, we assume (without deciding) that the State violated rule 16 by not disclosing Technician's reports or results about the size evidence. From there, we believe that Suhail has made "a credible argument" that this assumed failure impaired his defense. *Id.* But because the State has carried its burden of showing "that there is no reasonable likelihood that absent the error, the outcome of trial would have been more favorable for" Suhail, we decline to reverse. *Id.*

¶107   To assess this, we consider what the trial would have looked like if Technician's size testimony—but not the outsole comparison—had been excluded. *See State v. Ellis*, 2018 UT 2, ¶ 42, 417 P.3d 86 ("To decide whether a trial affected by error is reasonably likely to have turned out differently we have to consider a hypothetical—an alternative universe in which the trial went off without the error."). And for purposes of this analysis, we further assume that Technician would not have testified that Asics does not license their outsole patterns to other manufacturers.

¶108   We begin by noting that there's reason to think that in the actual trial, Technician's size testimony didn't matter much. This is because the size testimony was decidedly equivocal and, thus, weak. Technician testified that the shoeprint from the crime scene "could potentially be" a men's size 9.5 to 11.5, but she also told

the jury that she was "[n]ot very" confident in that estimate. And although she stated that the shoeprint looked "slightly larger than" the size 10 shoes, she said it was "really hard for [her] to say definitively" and that she didn't "know either way." She explained to the jury that it was difficult to make a size estimate because the actual shoeprint is three-dimensional, while the blueprints from Asics were two-dimensional and thus "flatter and larger than the actual impressions on the shoes." Technician was even more equivocal on cross-examination. When Counsel pressed her about size, she answered, "It was a complete guess. I don't know what size these shoes made from the blueprints. I don't have a clue." And when Counsel asked whether she had told the State about her inability to make a size estimate, she replied, "I told them I had no knowledge and no experience and that I shouldn't be making a qualification." In light of Technician's own repeated disclaimers about this testimony, we're somewhat skeptical that the jury would have nevertheless placed great emphasis on it in deliberations. *See, e.g.*, *State v. Samples*, 2022 UT App 125, ¶¶ 87–88, 521 P.3d 526 (holding that a defendant was not prejudiced by a witness's allegedly improper testimony where the testimony at issue was "decidedly equivocal"), *petition for cert. filed*, Jan. 3, 2023 (No. 20230007).

¶109 Also, in his closing argument, Prosecutor only referenced Technician's size testimony once. This may indicate that the State didn't think that testimony would persuade the jury. But more to the point, Prosecutor's lack of emphasis on this testimony also undermines any suggestion that the jury likely focused on it.

¶110 Moreover, in a hypothetical trial in which there was no such evidence, we still see no reasonable likelihood of a different outcome. It's true that the State's case was based on circumstantial evidence. But "[d]irect evidence is not required" to support a conviction, and "[s]ustainable verdicts are entered every day on the sole basis of circumstantial evidence." *State v. Nielsen*, 2014 UT

10, ¶ 47, 326 P.3d 645. And in our view, the State's case here, circumstantial as it was, was still quite strong.

¶111   First, Customer testified that he saw Suhail walking out of Victim's apartment shortly after midnight on Friday the 9th, and Detective testified that Suhail's phone was in the general vicinity of Victim's apartment from about midnight until 2:00 a.m. on Friday. Yet in a phone conversation with Customer, Suhail denied being at Victim's apartment and claimed he had been at home. This suggested not only that Suhail was lying, but that he thought he had something to hide with respect to his presence at Victim's home that very night.

¶112   Second, the cell phone data suggests that Suhail took Victim's phone. Detective testified that Suhail's and Victim's phones were both in the general vicinity of Victim's apartment between midnight and 2:00 a.m. on Friday, and he also testified that after 2:00 a.m., both phones were in the general vicinity of Suhail's mother's apartment. And Customer testified that he received text messages shortly after midnight on Friday from somebody claiming to be Victim, but it didn't seem to him like the texts actually were from Victim—Customer thought the spacing was odd, he noted that Victim usually just texted "Call me," and in these texts the sender claimed to have walked to a gas station, which was something that Victim usually didn't do.

¶113   Third, before Victim died, Suhail had no money, but after Victim died, Suhail made several cash purchases. On the night of Thursday the 8th, Suhail met with Victim and got two pills; he purchased the first pill for $20, but Victim had to front him the second pill. Indeed, Suhail had to borrow $20 from somebody just so that he could pay Victim back. But the very next morning, Victim paid his phone bill and gave Ex-Girlfriend $200. Suhail made several other cash purchases that day, including clothes, boots, and a knife. Moreover, when police arrested Suhail, he had over $1,000 on his person. And although Suhail later claimed that

he had money because he sold a car, that explanation made little sense because he also told police that Victim had to front him a pill when he couldn't afford to pay $20 for it.

¶114   Fourth, even though Suhail had scrambled to get just two pills from Victim on Thursday the 8th, around 4:00 a.m. on Friday the 9th, Suhail was texting another drug dealer and attempting to sell him large quantities of pills. And when police arrested Suhail, there were 40 Xanax pills in the car door next to where he was sitting.

¶115  Fifth, when police searched Victim's apartment, they didn't find his phone or any cash or pills, even though he was known for dealing drugs. This indicated that whoever murdered Victim also stole his phone, money, and pills.

¶116  Sixth, Ex-Girlfriend testified that on Friday morning, Suhail had a mark on his neck, which he said he "got in a fight."

¶117  Seventh, when Suhail and Ex-Girlfriend drove past Victim's apartment and saw police, Suhail asked Ex-Girlfriend if she "would keep in contact with him if he were to get locked up for 25 years." The jury could draw its own inferences about what Suhail meant, and in doing so, it could consider the relevant circumstances. Here, the relevant circumstances were that Suhail made this comment while driving past Victim's apartment shortly after Victim had been murdered and while Suhail was now observing a police presence there. One natural inference given those circumstances is that he was alluding to the possibility that he would be implicated in Victim's death.

¶118   Finally, a photo on Suhail's phone showed him wearing Asics Gel Resolution 5 shoes two months before Victim's death, and Technician concluded that the unidentified shoeprint from the crime scene was created by an Asics Gel Resolution 5 shoe. And even if Technician didn't inform the jury that Asics doesn't

license their outsole patterns to other manufacturers, she still could have testified that she didn't find any other shoes that matched the shoeprint. Moreover, when the police searched Suhail's mother's and brother's apartments, they never found his Asics Gel Resolution 5 shoes, which—given all this surrounding context—could have suggested that Suhail had disposed of them to avoid detection.

¶119 The most reasonable inferences to be drawn from these collected details are quite clear—namely, Suhail killed Victim and was bruised during the confrontation, stole Victim's money and drugs, tampered with Victim's phone in an attempt to show that Victim was still alive after he had left, and was then caught with Victim's money and drugs soon after.

¶120 Of course, Suhail made arguments to counter this evidence. For example, Customer said that when he saw Suhail leaving Victim's apartment, Suhail was wearing shoes that were similar to Vans. There was also some evidence that Suhail had money because he sold a car. And Suhail presented evidence that Neighbor had been in several violent incidents, including two that involved knives. But the evidence linking Suhail to this crime and its cover-up was far more direct, so even considering these counterarguments and even removing Technician's size testimony, the State has persuaded us that there was not a reasonable likelihood of a more favorable outcome for Suhail. *See Knight*, 734 P.2d at 921. Because there was no prejudice to Suhail, we conclude that the court did not abuse its discretion when it denied his request for relief based on the alleged rule 16 violation. *See id.* at 918.[19]

---

19. In the prejudice portion of his argument about the lack-of-notice issues, Suhail asserts that Technician's testimony about the outsole comparison or even the type of shoe was based

(continued…)

on "information from [Asics]" (such as the database), which qualifies as hearsay. Because lay witnesses can't rely on hearsay, *see* Utah R. Evid. 701, he then asks us to assume, as part of our prejudice analysis on the lack of notice, that Technician shouldn't have been allowed to make any outsole comparison at all.

We disagree with Suhail's suggestion that this testimony was attributable to a lack of notice of proposed expert testimony. Well before trial, Suhail filed a motion to exclude "any bloody footprint evidence," and as part of that argument, he argued that, as a lay witness, Technician couldn't testify about information she'd received from Asics. Although the State asserted that Technician would not be testifying as an expert, and although it agreed (at that time, anyway) that it wouldn't ask her about some of the information she had received from Asics (such as whether Asics licensed its sole design to other companies), the State still argued that Technician could make an outsole comparison. Despite Suhail's objection, the court allowed Technician to offer this testimony as a lay witness.

Thus, while Suhail now suggests that the outsole comparison itself is one form of prejudice stemming from the lack of notice of potential expert testimony, the record shows that notice was not the problem there. Suhail clearly knew that the proposed outsole comparison testimony existed before trial (which is why he objected to it), and he even received an adverse ruling that allowed it to come in as lay testimony. If Suhail wanted to appeal that ruling on the basis of Technician's reliance on hearsay, he could have done so directly. But he didn't. Instead, in the portion of his brief that focused on the outsole comparison, he argued relevancy and rule 403, but he said nothing about hearsay generally or the database more particularly. On this basis of the unchallenged portion of the court's ruling, this testimony would have therefore come in even without the notice of expert testimony.

(continued…)

E.      Ineffective Assistance of Counsel

¶121   In the alternative, Suhail argues that Counsel was ineffective for failing "to investigate Technician's opinions." We reject this argument for lack of prejudice.

¶122   A defendant arguing ineffective assistance of counsel must show that counsel was deficient and that the deficient performance prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish prejudice, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

¶123   As we understand his argument, Suhail is asserting that had Counsel investigated Technician's testimony more thoroughly, he would have known that the size 10 shoe was a women's shoe. And if Counsel had known that, Suhail suggests, Counsel would have attempted to keep the State from introducing

---

In any event, even if we accept Suhail's assertion that he can essentially backdoor this hearsay issue through the prejudice portion of his lack-of-notice arguments, we'd still conclude that he wasn't prejudiced. Separate from the size testimony, it's of course true that the State also relied on the outsole comparison testimony. Our above discussion makes that clear enough. But in light of the large quantity of other evidence discussed above linking Suhail to this crime that was unconnected to the shoeprint at all, we still see no reasonable probability that, even if all of the shoeprint testimony had been excluded, the jury would have reached a different verdict.

Technician's size testimony.[20] Even assuming that's all true, we are unpersuaded that there was any material harm to Suhail. As explained above, Technician's size testimony was weak because she told the jury that she was making "a complete guess" and was not qualified to make size estimates. And as also explained, the State presented strong circumstantial evidence beyond the outsole comparison. So even if Counsel had investigated Technician's testimony more thoroughly and decided against using any size testimony, Suhail has not shown a reasonable probability of a more favorable outcome. *Id.*

¶124   Suhail also seems to suggest that had Counsel investigated Technician's opinions more thoroughly, he could have called an expert to challenge Technician's testimony about sole-counterfeiting.[21] But Suhail has not provided any support for his claim that Counsel did not investigate a sole-counterfeiting

---

20. As previously explained, Prosecutor argued that Technician's size estimates were unreliable and asked the court to prohibit questions about those estimates. But Counsel argued that he should be able ask questions about the size estimates, and the court agreed. So although the State asked Technician about her size estimates on direct examination, it presumably only did so because it anticipated that Counsel would ask about them on cross-examination. For this issue, we take as correct Suhail's assertion that had Counsel known the size 10 shoes were women's shoes, he would have realized that Technician's size estimates were not favorable, he would have decided against arguing that the size estimates were fair game in trial, and neither party would have questioned Technician about her size estimates of the shoeprint.

21. As a reminder, Technician testified that shoes can be counterfeited but that it's mostly "higher-end shoes, like Air Force 1s, Michael Jordan shoes," that get counterfeited.

expert. *See State v. de la Cruz-Diaz*, 2012 UT App 179, ¶ 6, 282 P.3d 1041 (rejecting a failure-to-investigate claim when the defendant failed "to provide support in the record for his claim that counsel did not consult with an expert"). Nor has Suhail identified an expert that would have been available to testify and what that expert's testimony would have been. *See State v. Gerber*, 2015 UT App 76, ¶ 14, 347 P.3d 852 (rejecting a defendant's claim that trial counsel was ineffective for not calling a medical expert when the defendant did not identify "any medical expert who would have testified on her behalf at trial or set forth that expert's expected testimony in the record"); *see also Samples*, 2022 UT App 125, ¶¶ 62–63 (rejecting a rule 23B remand request when the defendant did not allege or proffer that the provided expert "could have been produced within any particular timeframe"). Accordingly, any argument that more investigation would have resulted in useful expert testimony is speculative and not sufficient to show a reasonable likelihood of a more favorable outcome for Suhail.

F.    Rule 23B Remand

¶125 In addition to the above arguments regarding the shoeprint evidence, Suhail requests a rule 23B remand so that he may present evidence that Neighbor wore a men's size 11 to 12 shoe. *See* Utah R. App. P. 23B. Suhail contends that this information will support an argument that Counsel was ineffective for not informing the jury about Neighbor's shoe size, which would have then supported the defense theory at trial that Neighbor was the actual killer.

¶126 A rule 23B remand is "available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *Id.* R. 23B(a). Accordingly, "a defendant must present the court with the evidence he intends to present on remand and explain how that evidence supports both prongs of the ineffective assistance of counsel test." *State v.*

*Gallegos*, 2018 UT App 192, ¶ 23, 437 P.3d 388 (quotation simplified).

¶127   Suhail's memorandum includes a sworn affidavit from Counsel. There, Counsel avers that he knew that Neighbor wore size 11 to 12 shoes and that he planned on presenting that evidence to support the defense theory that Neighbor, not Suhail, murdered Victim. But Counsel says that he then got distracted during trial and simply failed to present the evidence. From this, Suhail now contends that this would show that Counsel performed deficiently by not presenting the evidence, and Suhail further argues that there is a reasonable likelihood of a more favorable result if the evidence had been presented.

¶128   Suhail has presented us with "a nonspeculative allegation of facts, not fully appearing in the record on appeal." Utah R. App. P. 23B(a). But even assuming that Suhail has demonstrated deficient performance, we decline to remand the case because he has not shown prejudice.

¶129   Technician testified that the shoeprint at the crime scene could "potentially" have been created by a men's size 9.5 to 11.5 shoe. So if Counsel had presented evidence that Neighbor wore a men's size 11 to 12, Counsel could have argued that Neighbor fit within Technician's estimated size range. But this argument has limited potential. As explained above, Technician's size testimony was weak because she acknowledged that her own estimation of size was a "complete guess" and that she didn't "have a clue" what size of shoe had made the shoeprint. As a result, any argument about Neighbor's shoe size would have been based on this same shaky foundation.

¶130   Moreover, there was no evidence presented at trial that Neighbor ever owned a pair of Asics Gel Resolution 5 shoes, but the jury saw a photograph from Suhail's phone showing Suhail wearing these very shoes. There also was no evidence presented

at trial that Neighbor was at Victim's apartment around the time of his death, that Neighbor went from having no money or pills before the murder to suddenly having large quantities of both after the murder, or that Neighbor ever had Victim's cell phone, let alone in the hours after the murder.

¶131    In short, even with this proffered evidence about the size question, the strong circumstantial evidence recounted above still would have implicated Suhail, not Neighbor, in Victim's death. Suhail therefore has not shown that there's a reasonable probability of a better outcome had the jury known of Neighbor's shoe size. *See Strickland*, 466 U.S. at 694. We decline to remand the case for development of that evidence.

## II. Detective's Allegedly Improper Testimony

¶132    Separate from the various questions he raises about the shoeprint testimony, Suhail also argues that the district court exceeded its discretion when it allowed Detective to testify in direct examination that he did not find any evidence that contradicted the testimony from the State's witnesses. Suhail argues that this testimony "was irrelevant, inadmissible lay opinion, bolstering, an inadmissible conclusion, substantially more prejudicial than probative, and prejudicial." Even if Detective's testimony was improper, Suhail is not entitled to a reversal unless he was prejudiced by the testimony. "Trial error requires reversal only if a review of the record persuades the appellate court that without the error there was a reasonable likelihood of a more favorable result for the defendant." *State v. Boyle*, 2019 UT App 28, ¶ 16, 440 P.3d 720 (quotation simplified). We are not persuaded.

¶133    On cross-examination, Counsel brought up this testimony but then asked Detective if it was true that Customer had "changed his story several times." Detective agreed that Customer had. On further questioning from Counsel, Detective

agreed that there were inconsistencies between his police report and Friend's testimony about what time Friend said he saw Suhail at Victim's apartment. Furthermore, when Counsel asked if there "was evidence that things contradicted," Detective replied, "There is," thus undermining his own earlier claim.

¶134 Suhail, however, contends that Counsel's cross-examination was still not sufficient because it "did not adequately address and reaffirm all the contradictions." But it didn't need to. The complained-of testimony was that there were no contradictions at all, and yet Counsel's cross-examination showed that there had been. Counsel didn't need to go through each contradiction to make this point—simply questioning Detective about a few of them and then having Detective agree that there were contradictions successfully rebutted Detective's initial claim. Because Counsel's cross-examination mitigated any potential harm caused by Detective's allegedly improper testimony, Suhail has not shown prejudice.

### III. Prosecutorial Misconduct

¶135 Finally, Suhail argues that Prosecutor committed prosecutorial misconduct twice during closing argument, and Suhail then argues that the district court should have granted a mistrial or a new trial as a result.

¶136 "Both prosecutors and defense counsel enjoy considerable latitude during closing argument and may discuss fully from their viewpoints the evidence and inferences and deductions arising therefrom." *State v. Carvajal*, 2018 UT App 12, ¶ 24, 414 P.3d 984 (quotation simplified). But this latitude is not unlimited. *See State v. Alarid*, 2022 UT App 84, ¶ 44, 514 P.3d 610. For instance, "a prosecutor may not prompt the jury to consider matters outside the evidence." *Id.* (quotation simplified). "Such comments are problematic because of the possibility that the jury will give special weight to a prosecutor's statements, not only because of

the prestige associated with the prosecutor's office, but also because of the fact-finding facilities presumably available to the office." *Id.* (quotation simplified). Additionally, arguments are improper when they "amount to a personal attack on defense counsel or an insinuation that the defense intends to mislead the jury." *State v. Jones*, 2015 UT 19, ¶ 55, 345 P.3d 1195.

¶137 With respect to both of the statements in question here, we conclude that, even if there was prosecutorial misconduct, Suhail was not prejudiced by it.

A. "Murder Time"

¶138 During his closing argument, Prosecutor discussed Ex-Girlfriend's testimony that Suhail asked her whether she would "keep in contact with him if he were to get locked up for 25 years." Prosecutor then suggested that Suhail was implicating himself in Victim's murder, rather than some lesser crime. As part of this, Prosecutor said, "Twenty-five years isn't—isn't a drug time, it's not robbery time; it's murder time."

¶139 We agree with Suhail that this statement was improper because it prompted "the jury to consider matters outside the evidence," *Alarid*, 2022 UT App 84, ¶ 44 (quotation simplified)—i.e., what the sentence is for murder. The State did not admit evidence at trial establishing what the usual sentence is for murder, and indeed, it likely couldn't have. *See State v. Gallegos*, 2018 UT App 112, ¶ 32, 427 P.3d 578 ("Possible punishment is usually not a proper matter for jury consideration." (quotation simplified)). And we further agree with Suhail's suggestion that the jury would likely "give special weight," *Alarid*, 2022 UT App 84, ¶ 44 (quotation simplified), to Prosecutor's comment that 25 years is "murder time" because it would have naturally assumed that Prosecutor, as an employee of the district attorney's office, would know the potential sentences for various crimes. We thus conclude that this comment was improper.

¶140   But even so, we will not reverse unless Suhail has shown that the district court abused its discretion by not granting a mistrial or a new trial. *See State v. Maestas*, 2012 UT 46, ¶ 103, 299 P.3d 892; *State v. Harmon*, 956 P.2d 262, 276 (Utah 1998). "This standard is met only if the error is substantial and prejudicial such that there is a reasonable likelihood that in its absence, there would have been a more favorable result for the defendant." *Harmon*, 956 P.2d at 276 (quotation simplified). But this was not so here.

¶141   After Prosecutor made the improper comment, Counsel objected. The district court sustained the objection and then instructed the jury to "[d]isregard the statement about the number of years." Addressing the same comments moments later, the court gave a curative instruction in which it affirmatively informed the jury "that the sentence for murder is not[,] under the law, 25 years."

¶142   We are not convinced that this course of action was an abuse of discretion. "Jurors are presumed to have followed a trial court's instructions." *Zazzetti v. Prestige Senior Living Center LLC*, 2022 UT App 42, ¶ 44, 509 P.3d 776. And "curative instructions are ordinarily presumed on appeal to be effective, absent a substantial and prejudicial underlying error or irregularity." *State v. Curtis*, 2013 UT App 287, ¶ 25, 317 P.3d 968 (quotation simplified). After the court told the jury to disregard the "murder time" statement and gave its curative instruction, Prosecutor did not attempt to make this same argument again. And we have no reason to doubt that the jury disregarded the statement (as it had been instructed to do) or that it accepted the court's curative instruction on this point. *See Zazzetti*, 2022 UT App 42, ¶ 44; *Curtis*, 2013 UT App 287, ¶ 25. We are accordingly not persuaded that the misconduct was so "substantial and prejudicial" that the court abused its discretion by not granting a mistrial or a new trial. *See Harmon*, 956 P.2d at 276 (quotation simplified).

¶143 Despite this, Suhail argues that the curative instruction was inadequate because it said only "what a murder sentence is not." Suhail then suggests that his requested instruction—"that a murder sentence may be for life"—"might have cured the error by resolving the question the prosecutor's misstatement provoked." But Prosecutor was attempting to argue that by saying "[t]wenty-five years," Suhail must have been referring to murder and not some other crime. The court disrupted that argument when it told the jury to disregard the statement and when it then instructed "that the sentence for murder is not[,] under the law, 25 years." We are thus unpersuaded "that the prosecutor's comment was so prejudicial as to defeat the mitigating effect of the court's curative instruction[]." *Taylor v. State*, 2007 UT 12, ¶ 115, 156 P.3d 739 (quotation simplified); *see also Harmon*, 956 P.2d at 276–77 (holding that a district court did not abuse its discretion when it denied a mistrial motion based on prosecutorial misconduct, in part because the district court gave a curative instruction); *State v. Almaguer*, 2020 UT App 117, ¶ 18, 472 P.3d 326 (holding that a defendant was not prejudiced by a prosecutor's misstatement when the district court "swiftly and explicitly condemned" the misstatement and "reiterated" a relevant jury instruction).

B.     "Chicken Feed Bullshit"

¶144 During closing, Prosecutor also characterized one of Counsel's arguments as "chicken feed bullshit." Suhail contends that this comment was prosecutorial misconduct because it "was a personal attack, insinuating that Suhail attempted [to] mislead[] the jury." We reject this argument because it was not preserved and because Suhail has not demonstrated plain error.

¶145 When Prosecutor made this comment, Counsel did not object. Nor did Counsel challenge this comment when he later moved for a mistrial. Rather, Counsel's claim that this comment was prosecutorial misconduct first appeared in Counsel's motion

for a new trial. But "our supreme court has explained that raising an objection that could have been raised at trial for the first time in a post-trial motion is insufficient to preserve the issue for appellate review, because doing so deprives the trial court of an opportunity to address the claimed error, and if appropriate, correct it." *State v. Fredrick*, 2019 UT App 152, ¶ 21, 450 P.3d 1154 (quotation simplified); *see also State v. Fullerton*, 2018 UT 49, ¶ 49 n.15, 428 P.3d 1052 (explaining "that an objection that could have been raised at trial cannot be preserved in a post-trial motion").

¶146 Suhail's claim is thus unpreserved, and he must accordingly show plain error to succeed on appeal. And again, a defendant claiming plain error "must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *Johnson*, 2017 UT 76, ¶ 20 (quotation simplified).

¶147 Here, there's no real question that Prosecutor used a profane term as a pejorative description for one part of the defense's theory. We agree that this was both intemperate and unprofessional. And under understood norms of decorum and civility, this comment had no place in this trial. *See State v. Condon*, 789 N.E.2d 696, 715 (Ohio Ct. App. 2003) (explaining that a prosecutor's use of "bullshit" was "grossly unprofessional and clearly meant to inflame the jury"); *State v. Ward*, No. 18211, 2001 WL 220244, at *6 (Ohio Ct. App. Mar. 2, 2001) (stating that it was "entirely unprofessional" for a prosecutor to call expert testimony "bullshit"). Comments such as this one should not be made in an attorney's argument.

¶148 But again, the question before us is whether Suhail is entitled to reversal of his conviction as a result, and as we've explained, Suhail must show that he was prejudiced.

¶149 Aside from its incivility, Suhail argues that the term "bullshit" was prejudicial because, according to the Urban

Dictionary, the term carries a particular meaning that implies that the speaker is attempting to mislead someone.[22] While we acknowledge the potential linguistic appeal of this interpretation, we nevertheless don't see it as one that should have been obvious to the district court. When the district court heard this comment, it could have instead concluded that Prosecutor was simply challenging the strength of Counsel's substantive argument (as opposed to Counsel's personal veracity) in a vulgar way.[23] We are thus unpersuaded that the particular meaning that Suhail now gives this term should have been so obvious to the district court that it needed to interfere. *See Johnson*, 2017 UT 76, ¶ 20.

¶150 Furthermore, even if Suhail's particular interpretation of "bullshit" is one that should have been obvious to the district court, we still believe that the court could have reasonably concluded that it would be better not to interject. In some ineffective assistance of counsel cases, we have held that trial counsel did not perform deficiently for declining to object to a challenged statement if doing so might have drawn further attention to it. *See, e.g.*, *State v. Hulse*, 2019 UT App 105, ¶ 40, 444 P.3d 1158 (explaining that when a witness called the defendant "evil," it was "conceivable that a competent attorney would have chosen not to draw the jury's further attention to the fleeting exchange by objecting to its content"); *State v. Jimenez*, 2007 UT App 116, ¶ 11, 158 P.3d 1128. This dynamic holds true here too with regards to what the court was or was not required to do. In the very same moment

---

22. *See Bullshit*, Urban Dictionary, https://www.urbandictionary.com/define.php?term=Bullshit [https://perma.cc/2GPQ-UUNL] (defining "bullshit" as "lies or untrue stuff").

23. *See id.* (defining "bullshit" as "[a]nything ridiculous, and/or unnecessary").

in which the court would have had to decide whether to say something about this comment sua sponte, the same things that made the comment inappropriate in the first place (namely, its incivility and its disparagement of the defense's case) would have also suggested that the court might not want to focus the jury's attention on the comment by calling it out. Given this, it's not obvious that the court was required to intervene on its own without any prompting from Counsel. Put differently, since Counsel could reasonably think it was in the defense's best interests to simply let this comment slide without correction, the court could too.

¶151 Because there was no obvious error, we conclude that Suhail has not shown plain error. Because there was no plain error, we do not reverse on this ground.

## IV. Cumulative Error

¶152 Suhail's final argument is that even if no individual error merits reversal, the cumulative effect of the errors does.

¶153 A court must make "three determinations before reversing a verdict or sentence under the cumulative error doctrine: it must determine that (1) an error occurred, (2) the error, standing alone, has a conceivable potential for harm, and (3) the cumulative effect of all the potentially harmful errors undermines its confidence in the outcome." *State v. Martinez-Castellanos*, 2018 UT 46, ¶ 42, 428 P.3d 1038.

¶154 For purposes of Suhail's claim, we assume that the following errors occurred: (1) the admission of Technician's size testimony, (2) Counsel's failure to tell the jury about Neighbor's shoe size, (3) Detective's testimony that the evidence did not contradict the State's witnesses, and (4) Prosecutor's "murder

time" and "chicken feed bullshit" comments.[24] We also assume that each of these errors, "standing alone, has a conceivable potential for harm." *Id.*

¶155  Even if we combine these errors, we are not persuaded that they merit reversal. This is because—as explained above—Technician's shoe size testimony was relatively weak and Counsel effectively countered Detective's testimony by getting Detective to admit that there were contradictions. Additionally, the State presented a strong circumstantial evidence case. As recounted above, there was evidence placing Suhail at Victim's apartment around the time of death, evidence that Suhail left a bloody shoeprint in Victim's apartment, evidence that Suhail had a bruise on his neck the day after the murder, evidence that Suhail took Victim's phone, cash, and pills and had them after Victim's death, and testimony that Suhail made potentially incriminating comments to Ex-Girlfriend. Given all this, "the cumulative effect of all the potentially harmful errors" does not undermine our confidence in the outcome of Suhail's trial. *See id.* We therefore decline to reverse based on the cumulative error doctrine.

CONCLUSION

¶156  The district court did not abuse its discretion by admitting Technician's outsole comparison. Nor did it plainly err by not

---

24. We note that we can't truly aggregate all these errors together. This is because Counsel would not have introduced Neighbor's shoe size if Technician's size testimony had been excluded. Accordingly, we're considering two different hypothetical trials: one where there is no testimony about shoe sizes at all, and one where there is testimony about shoe sizes (but now including Neighbor's). In either hypothetical trial, our confidence in the outcome of the trial is not undermined. *See State v. Martinez-Castellanos*, 2018 UT 46, ¶ 42, 428 P.3d 1038.

interfering when Detective testified that the size 10 shoes were women's shoes. Suhail has not shown that the district court abused its discretion by declining to exclude evidence, grant a mistrial, or grant a new trial based on the State's alleged violation of the Expert Notice Statute and rule 16 of the Utah Rules of Criminal Procedure. He also has not shown that he was prejudiced by Counsel's alleged failure to investigate Technician's testimony or Counsel's failure to introduce Neighbor's shoe size.

¶157 Suhail also has not shown that he was prejudiced by Detective's testimony that the evidence did not contradict the State's witnesses. Nor has he shown that the court erred by not granting a mistrial or a new trial based on Prosecutor's "murder time" statement. And he has not shown that the court plainly erred by not interrupting when Prosecutor referred to Suhail's argument as "chicken feed bullshit." Finally, the cumulative effect of the alleged errors does not undermine our confidence in the outcome of Suhail's trial.

¶158  Affirmed.

———————