2024 UT App 30

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DAVID WAYNE AMES,
Appellant.

Amended Opinion*
No. 20220143-CA
Filed March 7, 2024

Eighth District Court, Duchesne Department
The Honorable Samuel P. Chiara
No. 211800119

Peter Daines, Attorney for Appellant

Sean D. Reyes and Emily Sopp,
Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which JUDGES
GREGORY K. ORME and DAVID N. MORTENSEN concurred.

TENNEY, Judge:

¶1      A jury convicted David Ames on three counts of possessing a dangerous weapon as a restricted person and one count of possessing drug paraphernalia. Ames now challenges his convictions on two grounds. First, he argues that he received ineffective assistance when his counsel failed to object to certain omissions in the jury instructions regarding the dangerous weapon counts. And second, he argues that he received ineffective assistance when his counsel failed to seek a directed

---

* This Amended Opinion replaces the Opinion that was originally issued on February 23, 2024. In this Amended Opinion, we have changed footnote 3, but the rest of the Opinion remains unchanged.

verdict on the drug paraphernalia count. For the reasons set forth below, we reverse one of Ames's dangerous weapon convictions, but we affirm his remaining convictions.

BACKGROUND[1]

*The Incident*

¶2    In April 2021, Ames lived in the basement unit of a duplex with his mother (Mother) and nephew (Nephew). Additional family members, including some children, lived in the duplex's upstairs unit. Ames was a Category I restricted person, which meant that he was prohibited from possessing a "dangerous weapon" under Utah Code section 76-10-503(2).

¶3    Ames suffers from schizophrenia. He had previously been prescribed medication for his condition, but he had stopped taking it "at least a couple of years" before April 2021. In Mother's experience, Ames's symptoms came in cycles. He would do "really well for a while" and then "kind of fall[] off." In the bad phases, Ames didn't "think accurately" and would become paranoid. In the days leading up to April 7, 2021, Mother observed Ames's symptoms worsening.

¶4    A few days before April 7, Ames brought an axe into his bedroom. Typically, the axe was stored outside, where he and the other "boys" in the house would sometimes use it to cut wood. Ames told Mother that somebody had stolen a different axe of his and that he needed this axe "for protection." When Mother tried

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Suhail*, 2023 UT App 15, n.1, 525 P.3d 550 (quotation simplified), *cert. denied*, 531 P.3d 730 (Utah 2023).

to substantiate Ames's claim, however, she found the other axe in its regular place.

¶5     On the morning of April 7, Mother looked out the window of the basement unit and saw Ames holding a chain with an attached padlock. Ames was "throwing [the] chain around and throwing it against the house and flipping it around over his head."

¶6     Mother stepped outside and asked Ames what he was doing. Ames entered the house and said that "[e]verybody was messing with him." Ames added, "I'm about to crack somebody's head open[,] and they're going to be just as dead as the two bodies under my bed." With his worsening schizophrenia symptoms in mind, Mother was worried that Ames might be referring to "one of . . . the kids at the house or me or somebody" with this comment. Ames then said, "Come with me. Come here and look and see and let me show you." Mother understood this to be an invitation to go to his room, but she was "concerned that he might do harm" to her, so she declined. Instead, she decided to call Ames's probation officer.

¶7     Mother began walking down the hall to retrieve her purse so that she could go to her car and make the call outside of Ames's hearing. Ames followed her. At some point, Ames picked up a "little hook" that he sometimes used to deep fry turkeys and began "swinging it around." Mother was now "concerned about being safe." As the two reached the end of the hallway and entered the kitchen, Ames turned and threw the hook down the hall into a closet.

¶8     Mother got into her car, drove "down the road a little ways," and then stopped and called Ames's probation officer. The probation officer advised her to call 911. After doing so, Mother returned to the house. Rather than returning to the basement, Mother went to the upstairs unit to warn the children who lived

there that Ames "wasn't thinking clear" and that law enforcement was "going to come talk to him."

¶9   Mother stayed in the upstairs unit until police officers arrived, but Nephew went downstairs to "grab a shirt." When he approached the door, Ames yelled, "Get the fuck out of the house." Nephew entered anyway, replying, "This is my house, too. I'm just coming downstairs to grab a shirt." Nephew heard Ames say "something about breaking [his] windshield," and he then heard a sound like "a chain" "jingling" "off of like wood." After retrieving a shirt from his bedroom, Nephew looked back to see what Ames was doing. He saw that officers had arrived and had stopped Ames at the front door of the unit.

¶10   Officers took statements from Mother and searched the residence. During that search, officers found the axe in a closet next to Ames's room where Ames stored his clothes, the chain and padlock outside the front door where Ames had thrown it when the police first arrived, and the turkey hook hanging from the ceiling fan in Ames's bedroom.

¶11   While officers were conducting their search, Mother also gave them a lightbulb that she had taken from the trash can in Ames's bedroom a few days earlier. This lightbulb was deformed in several unusual ways. First, it had "the part that screws into the light socket broken off" so that there was "a hole going all the way through." Second, there was a hole on top of the lightbulb with "somewhat melted" duct tape placed over it. And third, inside the lightbulb, there were "burn marks and some type of residue." Mother later explained that the other residents of the house "pretty much stayed out of" Ames's bedroom. She also explained that in the days leading up to April 7, she had become concerned that Ames was using methamphetamine due to his recent behavioral changes and increasing anger. On the day of his arrest, Ames tested positive for methamphetamine.

*Charges, Trial, and Jury Instructions*

¶12     The State charged Ames with a host of mostly possession-related offenses, but many of the counts were dismissed at a preliminary hearing. The case later went to trial on six counts: three counts of possessing a dangerous weapon as a restricted person, one count of possessing drug paraphernalia, one count of public intoxication (which was based on the positive methamphetamine test), and one count of disorderly conduct. The three dangerous weapon counts were based on the axe, the chain and padlock, and the turkey hook, respectively, while the drug paraphernalia count was based on the altered lightbulb that Mother found in Ames's trash can.

¶13     At trial, Mother and Nephew testified to the events described above. One of the responding officers (Officer) testified to the circumstances surrounding the seizure of various items and about Ames's positive drug test.

¶14     In the jury instructions, the jury was informed that for the possession of a dangerous weapon counts, the term "dangerous weapon" meant "an object that in the manner of its use or intended use is capable of causing death or serious bodily injury." *See* Utah Code § 76-10-501(6)(a)(ii). But no instruction informed the jury what the term "serious bodily injury" meant.

¶15     Ames was convicted on all counts. He now appeals.

ISSUES AND STANDARD OF REVIEW

¶16     Ames argues that his counsel was ineffective for (1) not requesting a jury instruction defining the term "serious bodily injury" as it related to the dangerous weapon counts and (2) not moving for a directed verdict on the drug paraphernalia count. "An ineffective assistance of counsel claim raised for the first time

on appeal presents a question of law." *State v. Suhail*, 2023 UT App 15, ¶ 72, 525 P.3d 550 (quotation simplified), *cert. denied*, 531 P.3d 730 (Utah 2023).

ANALYSIS

¶17     Ames argues that he received ineffective assistance on two grounds. To prevail on an ineffective assistance claim, Ames must show (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Ames must establish both prongs. *See State v. Suhail*, 2023 UT App 15, ¶ 122, 525 P.3d 550, *cert. denied*, 525 P.3d 730 (Utah 2023). If either is lacking, "the claim fails" and this court "need not address the other." *State v. Nelson*, 2015 UT 62, ¶ 12, 355 P.3d 1031.

¶18     To establish deficient performance, Ames must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (quotation simplified). The focus of this inquiry is reasonableness, and we "judge the reasonableness of counsel's challenged conduct, viewed as of the time of counsel's conduct." *State v. Carter*, 2023 UT 18, ¶ 45, 535 P.3d 819 (quotation simplified).

¶19     To establish prejudice, Ames "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Bonds*, 2023 UT 1, ¶ 53, 524 P.3d 581 (quotation simplified). When evaluating a prejudice claim in the ineffective assistance context, "we assess counterfactual[] scenarios—that is, what would have happened but for the ineffective assistance"—and "we may do so with the

evidence available to us, even when not part of the original record." *Ross v. State*, 2019 UT 48, ¶ 76, 448 P.3d 1203.

### I. Possession of a Dangerous Weapon

¶20 Ames was charged with three counts of possessing a dangerous weapon—one count each for the axe, the chain and padlock, and the turkey hook. Under Utah Code section 76-10-503(2), a "Category I restricted person" who "intentionally or knowingly purchases, transfers, possesses, uses, or has under the person's custody or control . . . a dangerous weapon other than a firearm is guilty of a third degree felony." For purposes of this offense, a "dangerous weapon" is either a "firearm" or "an object that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 76-10-501(6)(a). And "serious bodily injury" means "bodily injury that creates or causes serious permanent disfigurement, protracted loss or impairment of the function of any bodily member or organ, or creates a substantial risk of death." *Id.* § 76-1-101.5(17).

¶21 The jury was instructed about the elements of the offense and the definition of "dangerous weapon." But the jury was not given an instruction with the definition of "serious bodily injury." Ames now claims his attorneys provided ineffective assistance by not requesting that instruction.

### A. Deficient Performance

¶22 "The general rule for jury instructions is that an accurate instruction upon the basic elements of an offense is essential." *State v. Bird*, 2015 UT 7, ¶ 14, 345 P.3d 1141 (quotation simplified). "Ordinarily, non-technical words of ordinary meaning should not be elaborated upon in the instructions." *State v. Ekstrom*, 2013 UT App 271, ¶ 15, 316 P.3d 435 (quotation simplified). "Legal term[s] of art," however, generally "ought to be explicitly explained to a jury." *Bird*, 2015 UT 7, ¶ 19 (quotation simplified). In particular, a

definition is required where a term "has a technical legal meaning so different from its ordinary meaning that the jury, without further explanation, would misunderstand its import in relation to the factual circumstances." *Ekstrom*, 2013 UT App 271, ¶ 15 (quotation simplified). Failure to object to the absence of a relevant technical definition constitutes deficient performance where "correcting the error was sufficiently important under the circumstances that failure to do so was objectively unreasonable—i.e., a battle that competent counsel would have fought." *State v. Ray*, 2020 UT 12, ¶ 32, 469 P.3d 871.

¶23     In the context of Utah's criminal code, the term "serious bodily injury" is a legal term of art. As we explained in *Ekstrom*, the Utah Code employs a three-tiered system for certain offenses, and that system turns on particular gradations amongst the kinds of injuries (or potential injuries) at issue. 2013 UT App 271, ¶ 16. "Serious bodily injury" sits at the highest tier, followed by "substantial bodily injury," followed by "bodily injury." *See id.*; *see also* Utah Code § 76-1-101.5(4), (17)–(18). But the hierarchical relationship between these tiers might not be obvious to lay jurors from the names alone. We can readily imagine uninstructed jurors disagreeing, for example, about whether "serious bodily injury" is more severe than "substantial bodily injury." Indeed, Merriam-Webster's Thesaurus indicates that the terms "substantial" and "serious" are synonyms.[2]

¶24     Moreover, the legal definitions of these two terms and the differences between them are not obvious or intuitive. Under the statute, "serious bodily injury" "means bodily injury that creates or causes serious permanent disfigurement, protracted loss or impairment of the function of any bodily member or organ, or creates a substantial risk of death." Utah Code § 76-1-101.5(17). "'Substantial bodily injury' means bodily injury, not amounting

---

2. *Serious*, Merriam-Webster Thesaurus, https://www.merriam-webster.com/thesaurus/serious [https://perma.cc/ZA5Z-8RQ5].

to serious bodily injury, that creates or causes protracted physical pain, temporary disfigurement, or temporary loss or impairment of the function of any bodily member or organ." *Id.* § 76-1-101.5(18). As we explained in *Ekstrom*, "these different categories of injury are not subject to analysis using ordinary meaning. Rather, the Utah Legislature has assigned each a technical legal meaning that requires further explanation." 2013 UT App 271, ¶ 16 (quotation simplified).

¶25 The question here is whether Ames's counsel performed deficiently by not requesting an instruction for the term "serious bodily injury." We agree with Ames that it was objectively unreasonable for counsel to not request such an instruction. Not only would Ames have been entitled to such an instruction, but this instruction would have very likely helped his defense. Without an instruction, jurors who were approaching the question from common parlance alone could plausibly think that the term "serious bodily injury" includes injuries that fall far short of "serious permanent disfigurement, protracted loss or impairment of the function of any bodily member or organ, or creat[ing] a substantial risk of death." Utah Code § 76-1-101.5(17). By requesting and then receiving such an instruction, counsel would have ensured that the State was held to its full burden of proof for these three charged offenses. We accordingly conclude that this definition was "sufficiently important" that it "was objectively unreasonable" for counsel not to request an instruction on it. *Ray*, 2020 UT 12, ¶ 44.

¶26 The State pushes back, however, arguing that competent counsel could have reasonably concluded that the statutory definition would "draw unwanted attention to the kinds of injury that the metal items were capable of causing but did not in fact cause here." In the State's view, counsel's strategy may have been to highlight the items' use or intended use while minimizing any focus on the dangerous nature of the objects themselves.

¶27 But even under the relevant statutory definitions, the focus would have remained on the use or intended use of the objects. Again, for an object that's not a firearm, the term "dangerous weapon" means "an object that *in the manner of its use or intended use* is capable of causing death or serious bodily injury." Utah Code § 76-10-501(6)(a) (emphasis added). Jurors were given an instruction setting out these elements, and they were also told to "[t]hink about each instruction in the context of all the others." As a result, if jurors had been given an additional instruction with the definition of "serious bodily injury," this added instruction would not have given jurors license to disregard or minimize the "use or intended use" component of the elements instruction. Rather, this added instruction would have properly channeled that inquiry. And because the statutory definition for "serious bodily injury" sits at the highest tier of the statutory scheme, this additional instruction would have likely narrowed the range of injuries that could have been associated with Ames's "use or intended use," thereby heightening the State's burden of proof.

¶28 In these circumstances, we conclude that any competent attorney would have requested this additional instruction. As a result, we agree with Ames that it was deficient performance for his counsel not to have done so.

B.    Prejudice

¶29 Ames must also show that he was prejudiced. To do this, he must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. And when assessing such a claim, we may consider the counterfactual scenario of "what would have happened but for the ineffective assistance." *Ross*, 2019 UT 48, ¶ 76. So viewed, we agree with the State that Ames was not prejudiced by the deficient performance relating to either the axe or the chain and padlock. But we agree with Ames that he was prejudiced with respect to the turkey hook.

1.      The Axe

¶30     The question is whether there's a reasonable probability that the jury would have concluded that the axe was not "capable of causing death or serious bodily injury" under its "use or intended use" if the jury had been given an instruction on the meaning of "serious bodily injury." Utah Code §§ 76-1-101.5(17), 76-10-501(6)(a)(ii). We see no such probability.[3]

¶31     As is clear from a picture that was introduced as an exhibit at trial, the object in question was indeed an axe. And the record shows that it was sharp enough to cut things—Mother testified that before Ames brought it into the house, this axe had been outside where the "boys" would use it to cut wood for the family's wood burning stove. As for its use or intended use here, Mother testified that Ames told her that he needed to bring the axe into the home "for protection." The most natural reading of this statement is that Ames intended to use it as a weapon. And when an axe is used as a weapon, it's clear enough that it would be capable of causing "bodily injury that creates or causes serious

---

3. In the subsection of Ames's opening brief that addressed the axe, the subheading began by pointing out that "Ames Did Not Use the Axe at All on the Date at Issue," and the first sentence of that subsection then asserted that "Ames did not touch, hold, reference, or otherwise use the axe on the day at issue." In light of these assertions, we originally understood Ames to be suggesting that the axe wasn't actually in his "custody or control" on the day in question as required by statute. In footnote 3 of our original opinion, we explained why the evidence showed otherwise. After we issued the opinion, Ames's counsel filed a letter under rule 35(b) of the Utah Rules of Appellate Procedure (which sets forth the procedures for a petition for rehearing) informing us that he did not intend to make such an argument. With the added clarity provided by counsel's letter, we withdraw that analysis as unnecessary. This opinion is otherwise unchanged.

permanent disfigurement, protracted loss or impairment of the function of any bodily member or organ, or creates a substantial risk of death." *Id*. § 76-1-101.5(17).

¶32    Ames nevertheless suggests that when he said he needed the axe "for protection," this might have just been a reference to a potential "show of force." And in Ames's view, a mere "show of force" would not satisfy the "serious bodily injury" element. But this argument would have only worked if the jury had believed that Ames had no intent to then swing the axe if the "show of force" failed to ward off any potential threat. There's little reason to think that this was so, and even less reason to think that adding a definition for "serious bodily injury" would have convinced the jury of this. After all, the jury was instructed that it could only convict Ames if it believed that the axe's "use or intended use" was capable of causing "serious bodily injury." Although the jury may not have understood just how much injury was required, the given instructions did convey the requirement that some form of physical or "bodily injury" was required. By convicting Ames of this offense, the jury thus indicated that it did not view the evidence in the manner that Ames now suggests.

¶33    And there was good reason for this conclusion. Ames brought the axe into his bedroom during a period in which his schizophrenia-related symptoms were worsening. Mother testified that Ames was "kind of fall[ing] off" and wasn't "think[ing] accurately," and she also said that he was "ornery" and "wan[ted] to fight everything." Of particular note, on the day in question, Ames referred to the "two bodies under my bed," a comment that indicated that the use of force against people was on his mind.[4]

---

4. Ames's counsel did not raise a mental illness related defense below. Indeed, to the seeming contrary, counsel successfully

(continued…)

¶34　In light of all this, we don't see a reasonable probability that there would have been a different outcome on this count if the jury had been given an added instruction about the definition of serious bodily injury. Ames therefore has not shown prejudice relating to the lack of such an instruction.

2.　The Chain and Padlock

¶35　For similar reasons, we conclude that Ames was not prejudiced with respect to the count relating to the chain and padlock. A picture of the chain and padlock was introduced as an exhibit below, and it is included in the record on appeal. The picture confirms that the items were as described—a metal chain attached to a metal padlock. On the day in question, Ames was "throwing" the combo "against the house and flipping it around over his head." Shortly after Mother observed him doing this, Ames said that "[e]verybody was messing with him," after which he said, "I'm about to crack somebody's head open[,] and they're going to be just as dead as the two bodies under my bed." Mother was worried that the latter comment might be directed at one of "the kids at the house or me or somebody" and that Ames "might do harm" to someone. Indeed, Mother was worried enough that she drove away before calling Ames's probation officer so that Ames wouldn't hear the call.

¶36　Swinging a chain and padlock around with enough force to "crack somebody's head open" would plainly be an act that's capable of causing "serious permanent disfigurement, protracted loss or impairment of the function of any bodily member or organ" or creating "a substantial risk of death." Utah Code § 76-1-101.5(17). Given this, we see no probability (let alone a reasonable one) that Ames would have received a more favorable

---

objected when Mother speculated that Ames "truly" "believe[d]" his schizophrenic delusions. On appeal, Ames has not argued that counsel was ineffective for not asserting such a defense.

outcome on this count if the jury had been given an additional definitions instruction.

### 3. The Turkey Hook

¶37 The turkey hook, however, stands on different footing. Unlike an axe or a chain and padlock, this was not the kind of object that would readily produce serious bodily injury. At trial, Mother described this turkey hook as "little." As with the other objects in question, a photo of this was admitted as an exhibit at trial, and the photo shows that this hook is indeed "little." It has two curved metal prongs stemming out from a single metal spine, and it appears to be a fairly harmless kitchen utensil.

¶38 It might not take much force to cause serious bodily injury to another person with an axe or a chain and padlock. But from the available record, this turkey hook would likely have caused serious bodily injury to another only if it were used with an unusual amount of force or in an unusual way. There's no evidence, however, that Ames ever used (or intended to use) this turkey hook with such force or in such a manner. True, Mother testified that Ames was "swinging it around and stuff" while walking down the hall, and she likewise worried that "he might hit me." But Mother said nothing about whether Ames was using any particular amount of force, much less that he was using lots of force. And given that Mother was facing away from Ames for most of the time that he was wielding the hook, she may not have been in a position to observe those details anyway.

¶39 When evaluating a prejudice claim in the ineffective assistance context, we make our counterfactual determination using "the evidence available to us." *Ross*, 2019 UT 48, ¶ 76. Based on the evidence available to us here—the description of the turkey hook and the photo of it that was presented at trial—we believe that there's a reasonable probability that the jury would have acquitted Ames on the charge relating to the turkey hook if it had

been informed of just how much injury is required to qualify as a "serious bodily injury." We accordingly reverse Ames's conviction on this count.

## II. Possession of Drug Paraphernalia

¶40     Ames next argues that his attorneys were ineffective for failing to move for a directed verdict on the drug paraphernalia charge. We disagree.

¶41     "If the State presents no competent evidence from which a reasonable jury could find the elements of the relevant crime, then trial counsel should move for a directed verdict and the failure to do so would likely constitute deficient performance." *State v. Baer*, 2019 UT App 15, ¶ 7, 438 P.3d 979 (quotation simplified). If, on the other hand, the State presents "some evidence from which a reasonable jury could find all the elements, trial counsel's decision not to raise a futile motion for a directed verdict would not be deficient performance." *Id*. (quotation simplified).

¶42     In relevant part, the State was required to prove that Ames "possess[ed] with intent to use, drug paraphernalia to . . . inject, ingest, inhale or otherwise introduce a controlled substance into the human body." Utah Code § 58-37a-5(1)(a). The jury could consider "all" "logically relevant factors" when determining "whether an object" is drug paraphernalia, including "statements by an owner or by anyone in control of the object concerning its use," "the proximity of the object, in time and space, to a direct violation of this chapter," and "the existence of any residue of a controlled substance on the object." *Id*. § 58-37a-4(1), (3), (5).

¶43     Here, there was certainly "some evidence" from which a reasonable jury could find that Ames possessed this lightbulb and that it was drug paraphernalia. On the possession front, Mother said that she found the lightbulb in Ames's bedroom and that the other residents of the house "pretty much stayed out of" that

bedroom. *Cf. State v. Layman*, 1999 UT 79, ¶ 13, 985 P.2d 911 (explaining that a fact-finder may find "constructive possession" of drug paraphernalia where "the accused had both the power and the intent to exercise dominion and control over the . . . paraphernalia" (quotation simplified)).

¶44 On the question of whether the lightbulb was drug paraphernalia, there were several things suggesting that it was. First, there was the curious condition of the bulb itself. This lightbulb had "the part that screws into the light socket broken off" so that there was "a hole going all the way through," there was a hole on top of the lightbulb with "somewhat melted" duct tape placed over it, and there were "burn marks and some type of residue inside." Second, Mother testified that Ames's erratic and angry behavior in the days leading up to these events made her "concerned that [he] was using" methamphetamine. And third, Ames tested positive for methamphetamine on April 7. Taken together, a jury could reasonably conclude that Ames had used this altered lightbulb as a pipe with which to smoke methamphetamine.

¶45 Ames nevertheless points out that Mother took this lightbulb from his trash sometime before April 7. As a result, Ames argues that even if he "was high on meth on April 7, it was not by virtue of the lightbulb." Ames points to no expert testimony about the absorption rates for methamphetamine, but his point is still taken. Even so, however, the fact that Ames apparently got high that day through some other mechanism doesn't mean that he didn't previously use this lightbulb as a methamphetamine pipe too. Indeed, the statute states that a jury should consider "all" "logically relevant factors" when determining "whether an object is drug paraphernalia." Utah Code § 58-37a-4. So here, (1) Mother's suspicions that Ames was using methamphetamine, Ames's erratic behavior, and Ames's positive test on April 7, all suggest that Ames had an ongoing habit of using methamphetamine that extended up through April

7, as opposed to one that was confined to a single use on April 7; and (2) the particular alterations to the pipe and the presence of some "residue" inside it suggest that it had previously been used as some sort of pipe. While this may not have been the most conclusive of cases, there was at least "some evidence from which a reasonable jury" could find that this was indeed a methamphetamine pipe. *Baer*, 2019 UT App 15, ¶ 7 (quotation simplified). As a result, we see no basis for concluding that Ames's counsel performed deficiently by failing to request a directed verdict on this count.

CONCLUSION

¶46     On the possession of a dangerous weapon counts, Ames's counsel performed deficiently by failing to ask for a jury instruction that would define "serious bodily injury." Even so, we conclude that Ames was not prejudiced with respect to the convictions that were based on the axe and the chain and padlock. We do conclude, however, that Ames was prejudiced with respect to the conviction that was based on the turkey hook, so we reverse the conviction on that count.

¶47     On the possession of drug paraphernalia count, we conclude that there was some evidence to support the conviction. We accordingly reject Ames's claim that counsel was ineffective for not moving for a directed verdict on that count.

_____