2025 UT App 164

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
NATHAN DANIEL GRUNDVIG,
Appellant.

Opinion
No. 20230566-CA
Filed November 13, 2025

First District Court, Brigham City Department
The Honorable Brandon J. Maynard
No. 221100195

Freyja Johnson, Melissa Jo Townsend, and Emily
Adams, Attorneys for Appellant

Derek E. Brown and Christopher A. Bates,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN D. TENNEY concurred.

MORTENSEN, Judge:

¶1 Nathan Daniel Grundvig and his girlfriend (Kristina) got into an argument.[1] The incident escalated to the point where Grundvig prevented Kristina from leaving their home, threatened her, placed his hand over her mouth, choked her, slapped her, and punched her repeatedly. Because Kristina's memory of the assault was foggy, police bodycam videos recorded after the incident were presented during trial as exhibits to jog her memory, and these videos accompanied the jury into deliberations. During its examination of witnesses at trial, the State referred to Grundvig's prior acts of domestic violence against Kristina. On appeal,

---

1. We employ pseudonyms for the nonparties in this opinion.

Grundvig argues that he received ineffective assistance of counsel when his attorney (Counsel) failed to object to (1) the introduction of the other-acts evidence and (2) the video exhibits going with the jury into its deliberations. We reject these claims and affirm Grundvig's convictions.

BACKGROUND[2]

¶2 Grundvig and Kristina lived together with another couple, Josh and Angela. One day in May 2022, while Josh and Angela were out grocery shopping, Grundvig and Kristina got into an argument about one of their cats. This conversation upset Grundvig, who expressed his displeasure by throwing a can of cat food at the back of Kristina's head. Kristina told Grundvig she would not put up with such behavior and said that she was going on a walk. As Kristina made her way to the door, Grundvig told her that she was "not going to leave like that" and pushed her "away from the door," causing her to fall. Grundvig then held Kristina down, and she started screaming and telling him to get off her. Grundvig muffled her screams by holding his hand over her mouth, meanwhile telling her that "he wasn't going to stop," that "he was going to hurt" her, and that "he was going to kill" her. Kristina recalled being unable to breathe and that Grundvig also choked her. Kristina eventually pushed Grundvig off and fled to the bedroom. Grundvig apparently caught her and began slapping her hands and legs. Indeed, Grundvig slapped her with such force that he left a "hand mark" on Kristina's thigh. He also slapped her buttocks. She reported, "[H]e kept spanking me for some reason. I don't know why. Telling me I don't listen . . . ." Kristina broke free of Grundvig again and sought refuge in the

---

2. "We review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, presenting conflicting evidence only as necessary to understand issues raised on appeal." *State v. Mendoza*, 2025 UT App 46, n.1, 568 P.3d 265 (cleaned up), *cert. denied*, 570 P.3d 661 (Utah 2025).

bathroom. But Grundvig pushed the door open and began "pulling [her] hair and tossing [her] around." When Kristina grabbed his beard, Grundvig "freaked out and started punching [her] over and over in [the] face."

¶3　Josh and Angela returned at about this point, and the assault ended. They were alarmed when they saw a gash on Kristina's forehead, and Angela called 911. Before Kristina was transported by ambulance to the hospital, a police officer briefly interviewed her at the house. In that interview, she told the officer that she and Grundvig had an argument and she had tried to flee to the bathroom, but Grundvig followed her and hit her. The officer also interviewed Kristina while she was at the hospital. These interviews were recorded on the officer's bodycam. Kristina received six stitches to close the gash on her forehead.

¶4　The State charged Grundvig with one count of kidnapping for refusing to allow Kristina to leave, one count of forcible sexual abuse for slapping her buttocks during the attack, two counts of aggravated assault for placing his hand over her mouth and for choking her, and one count of assault resulting in substantial bodily injury for throwing the can of cat food at her, grabbing her hair, throwing her, and punching her with a closed fist.

¶5　At trial, the State's case included testimony from Kristina, Josh, and Angela. When Kristina testified, she said her memory of the incident after Grundvig pushed her to the floor as she tried to leave was "a little bit fuzzy." To refresh Kristina's memory, the State moved to offer four exhibits consisting of the bodycam video:

- Exhibit 22 showed Kristina when she was interviewed at the house. She was sitting on a couch and holding a bloodied towel in her hand. She explained that she and Grundvig got into an argument that "got way heated," she locked herself in the bathroom but "it didn't work," and Grundvig hit her.

- Exhibit 23 showed Kristina lying on a hospital bed. The gash on her forehead and bruises on her legs were visible. Kristina explained that Grundvig threw a can of cat food at her, stopped her from leaving, held her down, put his hand over her mouth, and said that he was going to kill her. In addition, Kristina said Grundvig pulled her hair and punched her in the bathroom. She then stated that the assault ended when Josh and Angela returned.

- Exhibit 24 also showed Kristina at the hospital. She said that Grundvig covered her mouth and nose with his hand and that she thought she lost consciousness or was close to losing consciousness. Kristina also explained that Grundvig had "choked [her] before" to the point that she had passed out. She further revealed that he had used "[b]oth hands" to choke her and he would "put [her] in [a] wrestling move where . . . his legs" would hold her arm above her head.

- Exhibit 25 was also from the hospital interview. Kristina stated that the bruises on her thighs were from Grundvig holding and slapping her. She also stated that Grundvig kept "spanking" her because she didn't listen.

Counsel did not object to the admission of these video exhibits. The State subsequently played them to assist Kristina when she testified about the assault.

¶6 On cross-examination, Counsel immediately asked Kristina if her relationship with Grundvig was "tumultuous." She said that it was. Counsel then asked, "And as a part of your relationship were you two involved in any use of illegal substances?" Kristina admitted that they frequently used methamphetamine and had, in fact, taken the drug on the morning of the incident. She testified, "I really think that drugs was a big factor in a lot of this because [Grundvig] turned into something that I had never seen before and I've known him for

years. But the drugs took over. I think he was trying to run from something and he didn't know how to cope with it. So he used more and more and more."

¶7     Counsel then played a portion of the bodycam video from Exhibit 25 that had not yet been played. In this portion, the officer asked Kristina if Grundvig had ever used a weapon against her or threatened to kill her. Kristina said that he had. But she also told the officer that Grundvig was not "violent," "control[ling]," or "jealous." After the video was played, Counsel asked Kristina about some of what she had said in the video. Specifically, he asked Kristina to confirm that Grundvig was "not controlling," did not "leave [her] threatening messages," and did not "spy" on her. Kristina confirmed that he did not engage in such behavior. Counsel also had the following exchange with Kristina:

> *Counsel*: [I]s this an event that happened frequently or is this something that just happened one time?
>
> *Kristina*: We've gotten into some arguments, but we always ended up pretty well by just separating.
>
> *Counsel*: And you don't actually remember being assaulted?
>
> *Kristina*: No.

¶8     On redirect, the prosecutor picked up where Counsel had left off, asking about Kristina's "history with the defendant" and whether Grundvig had "ever physically assaulted" her prior to the incident in question. Kristina responded, "Yes, but I had also hit him as well." The prosecutor then asked Kristina about a statement she made to the officer in her interview at the hospital:

> *Prosecutor*: [I]n the video you mentioned that he'd strangled you to unconsciousness before.

| | |
|---|---|
| *Kristina*: | Yes. |
| *Prosecutor*: | Do you remember that? |
| *Kristina*: | I do. |
| *Prosecutor*: | Tell us a little bit about that. |
| *Kristina*: | We had gotten into an argument a couple of times before that, and I don't remember exactly what happened . . . . [B]ut I think I threw some pizza at him and I had hit him a couple of times and then the next thing I remember is like waking up on the ground and I'm not really sure how. |

Kristina stated that Grundvig had "tried to stop [her] from leaving a couple of times" after arguments, explaining that Grundvig "was really trying to figure out something that [they] could do to help [themselves] because he didn't want this to happen again." The prosecutor also asked Kristina if Grundvig "had been aware of all the prior times he had hurt" her. Kristina responded, "Yes. And I was aware of what I had done as well."

¶9      Josh and Angela also testified. Josh stated that when he and Angela returned from the grocery store, Kristina said she couldn't breathe and was asking for help. He said Kristina had a gash on her forehead. Josh also said that he had "pulled [Grundvig] off of [Kristina] a couple of times" over the course of their relationship. Angela testified that while she had never seen Grundvig hit Kristina, there was an occasion when Josh had to pull Grundvig off Kristina. Angela stated that she saw Kristina bleeding when they returned. She also testified that the police had been called to the house in the past because "there was a lot of fighting" between Kristina and Grundvig.

¶10      Grundvig did not call any witnesses or testify in his own defense.

¶11 Pursuant to rule 404(b) of the Utah Rules of Evidence, the court instructed the jury that evidence Grundvig "engaged in physical altercations . . . before the acts charged in this case . . . was not admitted to prove a character trait of [Grundvig] or to show that he acted in the manner consistent with that trait" and that the jury "may consider this evidence, if at all, for the limited purpose of [Grundvig's] intent, knowledge, [or] absence of mistake." The jury convicted Grundvig as charged.

## ISSUES AND STANDARD OF REVIEW

¶12 On appeal, Grundvig advances two claims for ineffective assistance of counsel. First, Grundvig argues that Counsel should have objected on other-acts-evidence grounds when the State elicited testimony about his prior acts of domestic violence. Second, he claims Counsel unreasonably failed to object to the four video exhibits that the jury was permitted to take into deliberations. Claims of ineffective assistance raised for the first time on appeal present a question of law that we review for correctness. *State v. Ames*, 2024 UT App 30, ¶ 16, 546 P.3d 356, *cert. denied*, 550 P.3d 993 (Utah 2024).

## ANALYSIS

¶13 To establish ineffective assistance, Grundvig must demonstrate that Counsel's performance was deficient and prejudicial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). It is unnecessary for the court to address both prongs of this analysis when a party fails to establish one of the prongs. *Id.* Here, we limit our analysis to the deficient performance prong. To prove deficient performance, Grundvig "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (cleaned up). "The question of deficient performance is not whether some strategy other than the one that counsel employed looks superior

given the actual results of trial. It is whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial." *State v. Florreich*, 2024 UT App 9, ¶ 27, 543 P.3d 795 (cleaned up), *cert. denied*, 547 P.3d 828 (Utah 2024). In other words, "the performance inquiry will often include an analysis of whether there could have been a sound strategic reason for counsel's actions." *State v. Scott*, 2020 UT 13, ¶ 35, 462 P.3d 350. And "if the court concludes that the challenged action might be considered sound trial strategy, it follows that counsel did not perform deficiently." *Id.* (cleaned up).

## I. Other-Acts Evidence

¶14    Grundvig first argues that Counsel performed deficiently when he repeatedly failed "to object to inadmissible 404(b) evidence" introduced at trial. Specifically, Grundvig asserts that evidence of his "prior assaults against [Kristina] and physical altercations with" Josh was inadmissible under the plain language of rule 404(b) and that Counsel should have objected when Kristina, Josh, and Angela testified about the prior assaults.

¶15    Because we have no trouble identifying a sound trial strategy for Counsel's decision not to object to the other-acts evidence, we conclude that Counsel did not perform deficiently, given the circumstances of the case. First, the physical evidence that Kristina had been assaulted was abundant. Josh and Angela returned to the residence to find Kristina with a gash on her forehead. The police were called, and Kristina's injuries—the gash and the bruising on her body—were photographed. Second, Kristina had difficulty remembering what happened during the attack, so Counsel knew that the bodycam videos would be admissible. *See* Utah R. Evid. 803(5) (stating that a "record that: (A) is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately; (B) was made or adopted by the witness when the matter was fresh in the witness's memory; and (C) accurately reflects the witness's knowledge" is

not excluded by the rule against hearsay).[3] Counsel had viewed these videos and knew that they contained Kristina's detailed account of the assault soon after it happened.

¶16    Given the damaging evidence and admissibility of the bodycam videos, Counsel could have decided to make the best of a bad situation by highlighting Kristina's statements in Exhibit 25 that Grundvig was not violent, controlling, or jealous and that he didn't spy on her or send her threatening messages. Counsel even asked Kristina if something like the attack "happened frequently" or if it "just happened one time," to which she replied that she and Grundvig had "gotten into some arguments" but had "always ended up pretty well by just separating." By eliciting this favorable testimony from Kristina, it appears that Counsel could have been attempting to dispel the overwhelmingly negative image of Grundvig established by the other evidence.

¶17    Moreover, Counsel elicited testimony from Kristina that she had hit Grundvig in the past. Indeed, in closing, Counsel emphasized Kristina's admission that she and Grundvig "engaged in mutual hitting a lot," showing that "there was a lot going on in that house that shouldn't have been and it wasn't just [Grundvig] who was involved in it."

¶18    But Counsel could not have it both ways. By highlighting evidence that Grundvig was not violent, controlling, or jealous and that Kristina may have been violent herself, Counsel opened the door for the State to also address the evidence of Grundvig's prior physical altercations with Kristina. *See State v. Ramos*, 882 P.2d 149, 154 (Utah Ct. App. 1994) (acknowledging that a defendant cannot attack on appeal the admission of other-acts evidence when "he himself opened the door to its introduction on cross-examination"). This is a quintessential tactical decision and therefore cannot be the basis for showing deficient performance.

---

3. Indeed, on appeal Grundvig concedes that the bodycam videos were admissible.

This point is well illustrated in *State v. Whitchurch*, 2024 UT App 108, 554 P.3d 1166, *cert. denied*, 564 P.3d 960 (Utah 2025). In *Whitchurch*, this court found no deficient performance when counsel did not object to the admission of a jailhouse letter that contained both helpful and harmful information. *Id.* ¶¶ 56–58. There, we concluded that counsel could have strategized that the harmful information was "outweighed by the potential benefits" of other information in the letter and that the "decision not to object to the letter's admission into evidence did not amount to deficient performance." *Id.* ¶ 61. So too here. The only way for Counsel to get to Kristina's testimony that Grundvig was not controlling or violent was to address the dynamics of their past relationship, which was a tactic not without risk. But "deciding between the pros and cons of allowing the jury to hear evidence that has the potential to cut both for and against a defendant's case is a quintessentially tactical decision, which we will not question unless there is no reasonable basis supporting it." *Id.* ¶ 58 (cleaned up).

¶19 Having introduced evidence concerning the mutually combative nature of the relationship, Counsel ran the risk that the State would elicit further testimony on redirect to refute that defense theory, which, indeed, is what the State did. However, that Counsel's decision was not without this risk does not mean it was unsound from a strategic perspective, especially given the difficult facts Counsel faced. And because Counsel employed a reasonable tactical strategy, his decision to refrain from objecting to the State's line of questioning cannot form the basis for deficient performance. *See id.* Accordingly, this claim of ineffective assistance necessarily fails.[4]

---

4. Grundvig articulates an ancillary ineffective-assistance claim, arguing that Counsel should have specifically requested pretrial notice of evidence concerning Grundvig's other acts of domestic violence against Kristina. *See* Utah R. Evid. 404(b)(2)(A) ("On

(continued…)

## II. Exhibits in Jury Deliberation

¶20 Grundvig next argues that Counsel was ineffective for failing to object to the bodycam videos of Kristina's interview statements accompanying the jury into deliberations, contending that the jury's "unfettered access to the videos placed undue emphasis on [Kristina's] video statements without the counterpoint of her conflicting and equivocal trial testimony." But we conclude that Counsel's failure to object did not constitute deficient performance for two reasons.

¶21 First, under rule 17(k) of the Utah Rules of Criminal Procedure, "[u]pon retiring for deliberation, the jury may take with them . . . all exhibits which have been received as evidence, except exhibits that should not, in the opinion of the court, be in the possession of the jury, such as exhibits of unusual size, weapons or contraband." As our supreme court has observed, "[r]ule 17(k) expressly allows the jury to take *all* exhibits back to deliberations except those which the court decides in its discretion the jury should not have." *Wyatt v. State*, 2021 UT 32, ¶ 19, 493 P.3d 621. The court noted that the rule "contemplates a cumbersome or dangerous exhibit" as "inappropriate for the jury room." *Id.* The court specifically observed that the rule doesn't include a "testimonial" exhibit on its list of inappropriate exhibits for the jury room. *Id.* "[N]othing in the language of the rule," the court noted, "purports to bar testimonial exhibits from going back

_____

request by a defendant in a criminal case, the prosecutor must . . . provide reasonable notice of the general nature of any [other-acts] evidence that the prosecutor *intends to offer* at trial." (emphasis added)). Our resolution of the first issue obviates the need to address this claim. Since there is no indication that the State intended to introduce the other-acts evidence until Grundvig opened the door to its admission, this claim of ineffective assistance necessarily fails. Stated simply, the State could not have provided notice of its intent to introduce character evidence when, in fact, it did not intend to introduce that evidence.

with the jury." *Id.* Given this clear directive from our supreme court, we cannot conclude that Counsel performed deficiently in declining to lodge an objection that would have certainly failed. *See State v. Soto*, 2022 UT App 107, ¶ 31, 518 P.3d 157 ("A futile objection necessarily fails both the deficiency and prejudice prongs of the *Strickland* analysis because it is not unreasonable for counsel to choose not to make an objection that would not have been granted, and forgoing such an objection does not prejudice the outcome." (cleaned up)).

¶22 Second, Counsel may have wanted the videos to accompany the jury for tactical reasons. As noted, the videos contained information favorable to Grundvig: Kristina's statements that he was not violent, controlling, or jealous. The only way that the jury could view these statements again—limited in helpfulness though they may have been—was to allow the videos to go back with the jury. Thus, "where rule 17 does not generally preclude testimonial evidence from being sent back with the jury and where Counsel could have made the reasonable strategic decision to allow [the bodycam videos] to go back with the jury because he clearly considered . . . details therein as supportive of the defense's theory of the case, Counsel did not perform deficiently by failing to raise an objection under rule 17." *State v. Moore*, 2025 UT App 26, ¶ 53, 566 P.3d 69, *cert. denied*, 570 P.3d 658 (Utah 2025).

¶23 For these reasons, Grundvig's second claim of ineffective assistance of counsel also founders for lack of deficient performance.


CONCLUSION

¶24 Grundvig has not demonstrated that Counsel rendered deficient performance in failing to object to (1) the other-acts evidence presented at trial and (2) the bodycam videos accompanying the jury into deliberations. Because he has not

established deficient performance on either point, his claims of ineffective assistance of counsel necessarily fall short. We therefore affirm his convictions.

———————